**STATE of Minnesota, Respondent,**

v.

**Ronald D. GILBERT, Appellant.**

**No. 47124.**

Supreme Court of Minnesota.

July 7, 1978.

---

C. Paul Jones, Public Defender, Robert Oliphant, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert W. Johnson, County Atty., Edwin M. Wistrand, Asst. County Atty., Anoka, for respondent.

Heard before PETERSON, SCOTT, and IRVINE, JJ., and considered and decided by the court en banc.

L. J. IRVINE, Justice.*

This is an appeal from a judgment of conviction entered in Anoka County District Court. On May 24, 1976, defendant, Ronald Dennis Gilbert, age 26, was found guilty by jury verdict of two counts of first-degree murder and one count of third-degree murder. On May 25, 1976, defendant was given a sentence of 0 to 25 years for third-degree murder, a sentence of life imprisonment for one count of first-degree murder, to run consecutive to the third-degree murder sentence, and another life sentence for the second count of first-degree murder, to run concurrently with the other two sentences. We affirm.

Defendant did not testify at trial and offered no evidence except by way of cross-examination of the state's witnesses. The facts, as elicited from the state's witnesses, are as follows:

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

During the week March 17, 1976, Judith (Judy) Brask, age 26, who resided in an apartment in Brooklyn Center, Minnesota, engaged in several telephone conversations with one Edwin Hull, age 29, whom she formerly had dated and who called her from International Falls, Minnesota, inquiring as to whether she could assist him in obtaining a large amount of marijuana. Judy Brask called Daniel Ferguson, age 25, whom she said she was then dating and whom she said she planned to marry, to ask him if he could get together a large amount of marijuana for Hull. Ferguson said he would make some contacts. Eventually, he came to Judy's apartment and there followed a series of phone calls during the next several days between Ferguson and his contacts and between Ferguson and Hull in International Falls. It was finally agreed that Hull would drive down to Brooklyn Center and meet Ferguson in the Brask apartment.

Hull arrived at the apartment at about 3:30 a. m. on March 18. After some preliminary conversation with Ferguson, who had earlier brought in two grocery bags of marijuana, Hull went back to the parking lot and returned with the man he called his "partner." Judy identified him in court as defendant. Ferguson explained to the two men that there was a large amount of marijuana at the home of Robert Sarazin, a friend of his, but that they would have to go to Sarazin's home and pay for the marijuana before they could get it. They then left the Brask apartment and went to Sarazin's townhouse in Hilltop, Minnesota.

At the Hilltop townhouse Gary Olson, age 25, lived with Sarazin, age 25. Olson testified that at about 9 p. m. on March 17, Sarazin received a phone call, presumably from Ferguson, requesting assistance in getting together a large amount of marijuana for some buyers from Canada or International Falls. Sarazin, after several phone calls, succeeded in locating the amount of marijuana requested with his friend, Russ Weibye. Weibye brought two heavy bags of marijuana to the townhouse at about midnight and they were placed in the basement. It was agreed that Weibye would be paid when the sale to the eventual buyers was completed.

Sarazin and Olson waited downstairs for Ferguson and the others to arrive. At about 2:30 a. m., Mona Egan, age 19, Sarazin's girlfriend, arrived. She lived in the neighborhood, had been celebrating St. Patrick's Day, and had been slightly injured in an auto accident. She went upstairs to bed in Sarazin's bedroom. Later, Sarazin told Olson that there was to be only one person present when the buyers arrived, and he suggested that Olson go to bed. Thereupon, Olson went upstairs to his bedroom, undressed, and went to bed, but did not fall asleep.

At about 5:30 a. m., Olson heard a knock on the door downstairs and voices he did not recognize. After a pause, he heard someone say, "Tie them up." He guessed that Sarazin was being "ripped off" and decided to pretend to be asleep. Later, someone came into the room, cut the telephone cord, and left. Olson got up, got dressed, and then got back under the covers, lying on his back. Two men entered the room, turned on the lights, and pointed handguns at him. He identified one of the men as Hull, and testified that the other person, who was wearing a mask, was similar in size to defendant. They ordered him to lie on his stomach with his hands over his head. Olson then heard scuffling outside his room, heard Mona Egan scream, and heard a shot. Shortly thereafter, he grabbed the gun held by Hull, who was then the only other person in the room, and struggled with Hull for possession of the gun. The struggle lasted for 10 minutes and ranged from the bedroom into the hall and into the bathroom, where it ended in the bathtub. During the struggle, the gun was fired several times. Olson finally slammed Hull's head against the bathtub, causing him to lose his grip on the gun. Olson grabbed the gun and tried to shoot Hull with it, but the gun was empty. Hull ran down the stairs with Olson after him. Olson hit Hull on the back of the head with the butt of the gun, then, because Olson was exhausted, he let Hull escape through a window.

While he was struggling with Hull upstairs, Olson had heard several shots downstairs. After Hull escaped, Olson found Sarazin and Ferguson lying face down in pools of blood. The hands and feet of both men were tied with telephone cord. He rolled them over on their backs and saw that Sarazin was dead, but that Ferguson was still alive. Both had been shot in the back of the head. Olson ran upstairs and found Mona Egan lying in the doorway of Sarazin's bedroom. She also had been shot in the head, but was still alive. He ran next door to the home of his landlord and had him call the police, who arrived shortly. By that time, Ferguson was also dead. Mona was taken to a hospital, where she later died.

In the meantime, Hull called Judy Brask from a filling station and asked her to come and get him, because he was "hurt." When Judy arrived at the station, she was told that Hull had taken a cab to her apartment. She drove back to her apartment and found Hull in the parking lot. Hull got into her car and asked her to drive him to International Falls. He had blood on his jacket and a lump on his head, but he refused to discuss what had happened, although she pressed him for information about Ferguson. Hull slept during most of the trip to International Falls.

After Hull and defendant had gone into Olson's bedroom and held guns on him, Hull went into the other bedroom where Mona Egan was asleep. Defendant heard a commotion in the hall and then two shots. Hull came back and defendant started down the stairs. Hull told defendant to shoot the other two, which defendant did. He then went to his car, where he had placed the marijuana after tying up Sarazin and Ferguson, and he and Gerald Bahr[1] drove to International Falls. When Hull arrived in International Falls, he and defendant got together and divided the marijuana. Defendant took his share to the home of a friend and then went to Stratton, Ontario, Canada, where a cousin lived. All four

people, including Bahr, were arrested within a few days.

Defendant was arrested and brought to Fort Frances, just across the border from International Falls, where he was seen for the first time on March 24 by Richard Culton, an investigator for the Anoka County Major Crime Investigation Unit (MCIU). After his *Miranda* rights were read to him, defendant said he had an attorney and did not want to talk to Culton without his attorney being present. Culton did not question defendant, but told him that Hull was making it appear that defendant was the principal culprit in the crimes under investigation. Culton returned the next morning to Fort Frances, where defendant's attorney, Peter Hemstad, was present with defendant. After being read his rights again, defendant told Culton in narrative form about the events of March 17 and 18. Culton asked defendant and Hemstad if he could return in the afternoon and make a tape recording of defendant's statement. Hemstad said he had other engagements that afternoon which would prevent him from being present but he agreed that the statement of defendant could be taped in his absence if it covered only the topics gone over in the narrative statement of the morning.

In the afternoon, Culton read defendant his rights again, and then taped his statement, using the question-and-answer method. He covered the same ground that had been covered in the morning. After the statement was completed, he had it transcribed by a stenographer. Then he had defendant read it and initial any corrections defendant made. Defendant initialed each page of the statement at the bottom of the page and signed the statement on the last page. His signature was witnessed by Culton and Randy Borden, a police officer from International Falls who had been present at the taping. A copy of the statement was placed in defendant's property envelope in the Fort Frances jail.

---

1. Hull and defendant were accompanied by one Gerald Bahr, age 26, a friend of defendant who

remained in the car during the entire evening, part of the time in the trunk.

The statement was received in evidence at the trial "subject to [defendant's] previous objection," although the record does not indicate what the objection was, defense counsel having indicated that he had no objection to foundation. In his statement, which was read to the jury, defendant said that he had met Hull in a bar in International Falls through his sister-in-law "as a connection for dealing in drugs." Defendant had no money with which to pay for drugs but, according to defendant, Hull suggested that there was another way to get drugs, which would be "by ripping these people off down there in the cities." There were several telephone conversations between Hull in International Falls and Judy Brask in Brooklyn Center. Hull was trying to set up "a large buy worth about thirty thousand."

The original plan was for the transaction with Ferguson to be completed in the parking lot, after which Hull was to kill Ferguson. Then they were to take Judy Brask out of town, where defendant was to kill her. When they got to Judy's apartment and learned from Ferguson that another person was to be involved, the plan was changed so that after the transaction at Sarazin's townhouse was completed, Hull and defendant were to kill Ferguson and Sarazin, after which they would pick up Judy Brask, take her into the country, and kill her.

■ 1. The first issue raised by defendant concerns the trial court's failure to grant a requested continuance from Thursday, May 20, 1976, when the state rested its case, to Monday, May 24. The matter of granting a continuance is within the discretion of the trial court. *State v. Holmes*, 281 Minn. 294, 161 N.W.2d 650 (1968). This court has ruled that a conviction will not be reversed for denial of a motion for continuance except when such denial was a clear abuse of discretion. *State v. Huber*, 275 Minn. 475, 148 N.W.2d 137 (1967); *State v. Mohrbacher*, 173 Minn. 567, 218 N.W. 112 (1928). The record discloses that the only reasons given by defense counsel for the requested continuance were "in order to have more time to discuss defense strategy and to have a conference with my client" and "in order to grant us more time to adequately prepare our defense." However, counsel had already informed the court that he did not intend to present any testimony, and the court had told counsel that he intended to adjourn until May 24 before starting the final arguments and instructions.

■ Defendant contends that he was prejudiced by the lack of a continuance because the court had permitted an FBI agent to testify concerning ballistics and other tests over defendant's objection that he had not been given copies of the FBI reports until the day before the testimony. Here, the record indicates that late in March the prosecutor had sent guns and other items to the FBI laboratory in Washington, D. C., for testing and analysis. When he learned, on about May 10, that the trial would start on May 17, he called the FBI and told them that he needed the reports. On May 17, he sent a man from his office to Washington, D. C., to pick up the exhibits and reports. On May 18, he orally gave defense counsel the gist of the reports. On May 19, he gave counsel copies of the reports. At the time defendant objected to the testimony of the FBI agent, the following exchange took place at the bench between the court and defense counsel:

"THE COURT: You were—you were fully aware of the fact that the FBI was examining this stuff, were you not?

"MR. O'NEIL: Yes, Your Honor.

"THE COURT: Did you make any specific demand for anything other than the oral representations as to the gist of the report?

"MR. O'NEIL: None other than motions filed early concerning the court proceedings as to the open file system.

"THE COURT: You were aware last night that these people made examinations and stuff and were going to be called here to testify, were you not?

"MR. O'NEIL: Yes, Your Honor.

"THE COURT: Motion denied."

On the state of the record here, we find no abuse of discretion on the part of the trial court in refusing to grant defendant a continuance.

■ 2. Defendant contends that his right to due process of law was violated by the taping of his confession when his attorney was not present. This contention clearly has no merit. Counsel for defendant agreed, in the presence of defendant, to the taping of the confession in the absence of counsel on condition that the statement would cover the same material contained in the informal statement of that morning. There is no claim that the investigator deviated from that procedure.

■ 3. Defendant takes the position that the omnibus court in this case was in error in denying defendant a change of venue because of potentially prejudicial publicity given the case in the newspapers. In support of his position before trial, he submitted photo copies of news articles from nine different area newspapers, including those of both St. Paul and Minneapolis. He also submitted affidavits from the defense counsel's secretary and from defendant himself, stating in effect that the publicity would prevent the selection of an impartial jury in Anoka County. However, there were no affidavits from any member of the general public or from any potential juror that the publicity was prejudicial. As a matter of fact, most of the articles submitted appear to represent straight news reporting, with no attempt being made to dramatize the situation unduly. The potentially most prejudicial articles consisted of a series that ran in the St. Paul newspapers between April 12 and April 15, 1976. These articles explored the backgrounds of the murder victims in this case and portrayed them in the light most favorable under the circumstances. They also dwelt on other murders which had been committed in the Anoka County area during the same period of time. It might have been better had the publication of these articles been delayed until after the trials, when they would have been equally as informative to the public as if published before trial. Even so, there is no evidence that any large segment of the population of Anoka County even read the articles or that they were influenced by them unfavorably to defendant. Most important of all, there is no evidence that during voir dire any prospective juror claimed to have been prejudiced by the publicity. The mere presence of adverse publicity prior to a criminal trial is not per se prejudicial, and the burden is on the defendant to demonstrate the prejudice in some reasonable manner.

■ It is well settled in this state that the ordering of a change of venue because of unfavorable publicity or prejudice in a community is within the discretion of the trial court. *State v. Collins*, 276 Minn. 459, 150 N.W.2d 850, certiorari denied, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1967); *State v. Dehler*, 262 Minn. 171, 115 N.W.2d 358 (1962). The determination of the trial court will not be overturned unless there has been a clear abuse of discretion. *State v. Thompson,* 266 Minn. 385, 123 N.W.2d 378 (1963); *Berry v. North Pine Elec. Cooperative, Inc.,* 235 Minn. 562, 50 N.W.2d 117 (1951). We find no abuse of discretion by the trial court in this case.

Affirmed.