**STATE of Minnesota, Respondent,**

v.

**Edwin Clay HULL, Appellant.**

**No. 47285.**

Supreme Court of Minnesota.

Aug. 18, 1978.

C. Paul Jones, Public Defender, Phebe Haugen, Asst. County Atty., Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert Johnson, County Atty., Edwin Wistrand, Asst. County Atty., Anoka, for respondent.

Heard before ROGOSHESKE, TODD, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

Defendant, Edwin Clay Hull, was indicted by an Anoka County grand jury on three counts of first-degree murder. At his omnibus hearing, defendant moved to suppress a statement given by him to the police following his arrest. He also moved for a change of venue, alleging that pretrial publicity made it impossible for him to receive a fair trial in Anoka County. The trial court denied both motions, and a jury found defendant guilty on all three counts of first-degree murder. We affirm.

This case arises out of a triple murder committed in the early morning hours of March 18, 1976. On that date, defendant herein and an accomplice, Ronald D. Gilbert, engaged in what was to have been the purchase of a quantity of controlled substances from a seller in the community of Hilltop, Minnesota. Defendant and Gilbert, however, changed the nature of the transaction from a purchase to a robbery, and

the killings ensued. Gilbert was apprehended in Canada and returned to Anoka County for trial. His conviction was affirmed by this court in *State v. Gilbert*, 268 N.W.2d 576 (Minn.1978).

The present case concerns only the conviction of Edwin Hull. Since the issues he raises on appeal do not directly involve the manner in which the robbery and murders were carried out, those facts will not be reiterated here.[1] Instead, the events pertinent to this appeal occurred subsequent to Hull's arrest.

Defendant was arrested at about 9:30 p. m. in International Falls on March 18, 1976, the same day on which the murders took place. The arresting officer, a city policeman, took Hull to the Koochiching County jail where he remained overnight. The next morning, Hull contacted an attorney who was at that time representing him in a child custody matter. The attorney, Robert Leali, visited Hull at the jail and spoke with him for about 20 minutes, beginning at approximately 10:30 a. m. on March 19. He described Hull as "disheveled and wide-eyed" and testified that Hull's statements "made no sense at all to me." This testimony was apparently based on the fact that Hull gave conflicting stories as to the whereabouts of himself and a female companion, Judith Brask, at the time of the killings. Leali also opined that Hull seemed to be "experiencing very severe withdrawal symptoms" during their conversation.

On the basis of these observations, Leali determined that it would be more productive to question the defendant again later in the day "when he simmered down and made some sense." Leali did inform defendant, however, that he would represent him and also advised him not to speak to anyone. At that point, Leali was satisfied that an attorney-client relationship had been established between himself and defendant. Accordingly, as he left the jail, Leali specifically requested of the sheriff that no one speak to defendant until after Leali himself had interviewed defendant for a second time. Both Leali and the sheriff

knew that Anoka County investigators were enroute to International Falls for the purpose of speaking with defendant, and Leali expressly included these officers in his request that no one communicate with defendant.

At approximately 3 p. m., two Anoka County investigators arrived at the jail. In spite of Leali's request, one of the officers was taken to defendant's cell. The officer had been informed that defendant was represented by counsel and acknowledged this fact before reading defendant a *Miranda* warning. Defendant waived his rights, however, and agreed to talk with the officer. After 20 to 30 minutes of conversation, the officer terminated the interview to make arrangements for the return trip to Anoka County with defendant and Judith Brask in custody.

At this point, Hull asked to contact his attorney and was allowed to make several calls in an attempt to locate Leali. He was ultimately unable to reach Leali, who had traveled to Eveleth or Virginia, and left a message asking the latter to meet him in Anoka at suppertime. Defendant, Brask, and the officers then departed for Anoka in a small plane.

At the omnibus hearing, the officer who interviewed defendant in jail described him as "emotional" and "nervous", with shaking hands and bloodshot eyes. The officer characterized defendant's speech, however, as ungarbled and coherent, and stated that defendant did not appear to be directly under the influence of a drug but did seem to be "coming down on something."

During the plane flight to Anoka, defendant seemed to relax and made several overtures to the officer concerning the murders. On each occasion, the officer reminded him that he had no obligation to speak, but defendant persisted. None of the officers' warnings given on the plane were complete *Miranda* warnings. The officer submitted that although defendant initiated the conversation and was not simply responding to questioning, the officer did begin to ask

---

1.  See, *State v. Gilbert*, 268 N.W.2d 576 (Minn. 1978).

him more specific questions later in the flight.

Meanwhile, Leali had received defendant's message and began an attempt to locate him. The aircraft, however, had been forced down by weather conditions, causing a long delay in defendant's arrival at Anoka. When numerous attempts to reach defendant by telephone failed, Leali succeeded in persuading the Koochiching County sheriff's office to send a teletype to Anoka County, addressed to defendant. The teletype advised defendant not to answer any questions and stated that Leali would visit him in Anoka the following day, March 20.[2] When defendant finally arrived in Anoka—shortly before midnight on March 19—he was given this teletype to read. Despite its contents, defendant indicated his willingness to continue talking with the officers and signed the teletype as follows:

"I received this and I understand this fully.

[Signed] Edwin C. Hull
March 19, 1977 [sic]
11:56PM

"I agreed [sic] to talk to Det. Schnagl.
[Signed] Edwin C. Hull"

Shortly thereafter, while one of the officers was out of the room, defendant volunteered the statement that he had shot one of the murder victims, but that it had been an accident. When asked if he wanted to talk about the whole incident, he replied in the affirmative. The officers proceeded to tape record defendant's responses to specific questions propounded to him. A transcript was made from the tape and was signed by defendant. In the statement defendant again admitted shooting one of the victims, but maintained that the shooting was accidental. The statement also contained information which, if true, would have tended to shift primary responsibility for the crimes to defendant's accomplice, Ronald Gilbert.

The defense motion to suppress this statement was denied, as was a motion for a change of venue based on pretrial media publicity. Defendant's case was tried before a jury in Anoka County, and the statement given to the investigating officers was admitted against defendant. The jury found defendant guilty on three counts of first-degree murder. He was sentenced to three concurrent life terms on August 4, 1976.

On appeal, defendant challenges the admissibility of his signed statement and the propriety of the ruling denying him a change of venue for trial. Specifically, the issues raised are:

(1) Should defendant's incriminating statement have been suppressed because defense counsel was not afforded the opportunity he requested to revisit his client prior to any police questioning?

(2) Did defendant lack the capacity to make a truly intelligent and voluntary waiver of his Fifth Amendment rights in connection with the giving of his statement to the police?

(3) Did a user-supplier drug relationship exist between the police and defendant so as to render his waiver of Fifth Amendment rights involuntary?

(4) Did the trial court commit reversible error in failing to grant defendant's motion for a change of venue?

■ 1. Defendant argues that because his inculpatory statement was the product of police questioning which occurred after defendant had retained counsel and in violation of counsel's specific request, the admission of the statement at trial was constitutionally impermissible. This contention finds support in two previous opinions of this court. In *State v. Renfrew*, 280 Minn. 276, 280, 159 N.W.2d 111, 113 (1968), we stated:

"Even where a defendant voluntarily and intelligently waives his constitutional rights, we strongly disapprove of in-custody interrogations if defendant is represented by counsel and counsel has not had an opportunity to be present at the questioning."

---

**2.** Leali did not in fact visit defendant in Anoka until Sunday, March 21.

We reaffirmed this view in *State v. Fossen*, Minn., 255 N.W.2d 357, 362 (1977):

"While we rest our decision on the considerations already expressed, our opinion is buttressed by the fact that no attempt was made by any law enforcement officer to insure that defendant's counsel was notified of the interrogation and afforded the opportunity to be present. This, in spite of the fact that the police were aware that defendant had been advised to make no statement. We expressed our disapproval of the interrogation of an accused in the absence of already retained counsel in *State v. Renfrew*, 280 Minn. 276, 280, 159 N.W.2d 111, 113 (1968) * * *.

\* \* \* \* \* \*

"We reiterate that disapproval today, in the strongest of terms."

Once again we find ourselves confronted with a situation in which the police have taken steps to elicit information from a suspect where they knew the suspect to be represented by counsel, knew the suspect was under instructions to answer no questions, and knew that counsel could not possibly be present to provide further advice. Securing a waiver from a suspect under such circumstances calls into question the voluntariness of the waiver, and it is this prospect which we find gravely troublesome. When a suspect is sufficiently concerned to exercise his constitutional right and obtain legal representation, the effectiveness of that right is undermined by police practices, however benign, intended to extract incriminating evidence in the absence of counsel. In this case, defendant was in constant contact with police officers for a period of nearly 12 hours prior to waiving his right to remain silent. At no time during this period was counsel present. By the time defendant signed the transcript of his recorded statement, he had been up all night long with police officers. Under

these circumstances, the presence of retained counsel is extremely important for the intelligent waiver of a constitutional right and for the continued exercise of the right to legal representation. We are not unmindful of the fact that the Anoka County investigators in this case were in diligent pursuit of the perpetrator of a heinous crime. Nevertheless, we could only express unqualified approval of their actions had the officers afforded defense counsel a reasonable opportunity to be present for the waiver of defendant's rights.

Defendant urges us to adopt the extreme position taken by the New York court in *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y. S.2d 419, 348 N.E.2d 894 (1976). The *Hobson* case reaffirms a per se rule of suppression in New York courts for statements obtained from suspects whose previously retained attorneys were not present for the giving of the statement. The state argues that a per se rule is too rigid and that each case should be reviewed on its own facts to determine whether a suspect's waiver of his right to remain silent was truly voluntarily made, even in the absence of counsel. We find it unnecessary to resolve this difficult question,[3] however, because even if the taking of defendant's statement was improper, the admission of the statement at trial cannot be said to have prejudiced defendant. It is well settled that where constitutional error is harmless beyond a reasonable doubt, its presence in a criminal trial does not mandate reversal by a reviewing court. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Grey*, 256 N.W.2d 74 (Minn.1977).

We have no difficulty holding that the admission of defendant's statement in the present case was unquestionably harmless. In view of the truly overwhelming evidence

---

**3.** For decisions in addition to *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976), which have considered the issue, see, *United States v. Thomas*, 474 F.2d 110 (10 Cir. 1973); *People v. Isby*, 267 Cal.App.2d 484, 73 Cal.Rptr. 294 (1968); *In re Robinson*, 125

Vt. 343, 215 A.2d 525 (1965); *Commonwealth v. McCarthy*, 348 Mass. 7, 200 N.E.2d 264 (1964); *State v. Witt*, 422 S.W.2d 304 (Mo. 1967); see, also, *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

against him, the defendant's recorded statement was utterly superfluous as an item of the state's proof. Testimony concerning defendant's role in the drug theft and shooting was given by his accomplice, Ronald Gilbert; a friend who rode along to the scene of the crime, Gerald Bahr; a person who was present at the scene of the crime but survived, Gary Olson; defendant's female companion, Judith Brask; and Gilbert's sister-in-law, Patricia Droba. Each of these witnesses had either first-hand knowledge of the crime or heard Hull admit to shooting one of the three murder victims, or both. Thus, we have no doubt that the suppression of defendant's statement would not have altered the jury's perception of the case in any way whatsoever.[4]

2. Defendant next argues that because he was suffering drug withdrawal symptoms following his arrest, he lacked the capacity to make a truly voluntary waiver of his Fifth and Sixth Amendment rights. As such, it is urged, defendant's recorded statement should have been suppressed. Having already determined that the admission of the statement was not prejudicial, we find it unnecessary to pass on defendant's capacity to make a valid waiver of his rights.

3. While in custody in the Koochiching County jail on the morning of March 19, defendant complained of a headache and was allowed to take one pill from a bottle of prescription medicine found on his person at the time of his arrest. When defendant arrived in Anoka much later in the day, he requested additional medication, apparently still suffering from a headache. In accordance with the rules of the Anoka jail, defendant's request was denied. Defendant contends that by giving him a pill early in the day the custodial authorities established a drug user-supplier relationship with defendant. The creation of this relationship is alleged to have given the police even greater control over defendant's power of will and robbed his statement of the requisite element of volition. We have carefully reviewed the record and find this

assertion to be entirely without merit. While it is not disputed that defendant received a single pill from the Koochiching County jailer, there is absolutely no indication that this medication was in any way related to the withdrawal symptoms observed by attorney Leali and the police officers.

4. Defendant's final contention is that the district court erred in refusing to grant a change in venue. Defendant's motion was predicated largely on the volume of newsprint generated by the offenses he committed and by several other murders which occurred within a relatively short timespan in Anoka County. However, in a separate proceeding defendant's accomplice, Ronald Gilbert, also moved for a change of venue, citing the same media publicity which defendant now decries. Gilbert's motion was also denied, and on appeal we affirmed that denial. Since the present defendant and Gilbert were tried within two months of one another and the media publicity was virtually identical in the two cases, we see no reason why *State v. Gilbert, supra,* should not control the venue issue in this appeal.

The judgment of conviction is therefore affirmed.

Affirmed.

---

4. Indeed, given the bulk of the evidence against Hull, we find it somewhat difficult to understand the prosecutorial decision to introduce this highly questionable bit of evidence.