**STATE of Minnesota, Petitioner, Appellant,**

v.

**Edwin Olaf VICK, Respondent.**

No. C7–99–1949.

Supreme Court of Minnesota.

Aug. 30, 2001.

Mike Hatch, Atty. Gen., Thomas R. Ragatz, Asst. Atty. Gen., St. Paul, William J. Hennessy, Cook County Atty., Grand Marais, for appellant.

Steven E. Wolter, Douglas A. Kelley, P.A., Minneapolis, for respondent.

## OPINION

LANCASTER, Justice.

In May 1999, respondent Edwin Olaf Vick was found guilty by a jury and convicted of second-degree criminal sexual conduct in violation of Minn.Stat. § 609.343, subd. 1(a) (2000). Vick petitioned for postconviction relief, alleging ineffective assistance of trial counsel and insufficient evidence to support the conviction. The postconviction court denied Vick's petition. Vick subsequently appealed his conviction to the court of appeals, arguing that the trial court committed plain error when it admitted unnoticed and unproven *Spreigl* evidence. Vick also appealed the denial of his petition for postconviction relief. The court of appeals reversed the conviction and ordered a new trial, agreeing with Vick that the trial court committed plain error by admitting the *Spreigl* evidence. *State v. Vick*, No. C7–99–1949, 2000 WL 890468, at *3 (Minn. App. July 3, 2000). The state appeals, arguing that the trial court's failure to sua sponte strike the alleged *Spreigl* testimony or provide a cautionary instruction was not plain error. We conclude that the trial court did not commit plain error, reverse the court of appeals' decision, and reinstate the jury verdict.

On December 27, 1997, C.G. and Dan Vick (Dan) went on vacation and left their two children, A.B. and J.V.,[1] in the care of Dan's father, Edwin Vick (Vick). The children stayed with Vick at his cabin in Cook County. C.G. and Dan collected the children on Wednesday, December 31, at Vick's home in Silver Bay. Neither parent noticed anything unusual about seven-year-old A.B.'s behavior then. During this time, A.B. lived with C.G., Dan, and J.V. in the Duluth area.

A.B. spent the following weekend with Cheryl Swanson, A.B.'s daycare provider and "second mother." A.B. joined Cheryl and her son Joshua for a weekend at Cheryl's boyfriend's farm near Floodwood. During the weekend, Joshua and A.B. approached Cheryl and Joshua told her that A.B. had something to say. According to Cheryl, A.B. put her head down and began wringing her hands, then asked Joshua to tell Cheryl. Joshua explained that A.B.'s grandpa had touched her "private parts." Cheryl asked whether A.B. told her mother, and A.B. replied that she had not because she did not want her grandpa to get in trouble. Subsequently, Cheryl called C.G. and told her that she wanted to get together to talk. She did not elaborate, but the two planned a meeting for the Monday after Cheryl returned from the farm.

Cheryl brought A.B. home on Sunday, January 4, 1998. That night, C.G. asked A.B. if anything had happened over the weekend. At that point, A.B. took her mother into her parents' bedroom and explained that Vick had touched her. A.B.

---

1. C.G. is A.B.'s mother. At the time of these events, C.G. had the same last name as A.B., which was the last name of A.B.'s biological father and C.G.'s first husband. A.B.'s biological father died before she was born, which was in November 1990. Subsequently, C.G. entered into a long-term relationship with Dan Vick, although the two never married.

At the time of these events, A.B. referred to Dan as "dad" and to Vick as "grandpa." C.G. and Dan had one child, J.V., in 1993. C.G. and Dan broke off their relationship in January 1998 and C.G. moved out. C.G. remarried in May 1998, at which time she took a new last name.

told her story reluctantly, telling her mother that she did not want Vick to get in trouble. C.G. asked Dan to come into the bedroom and told A.B. to tell Dan what she had told C.G. A.B. repeated it, and Dan began to cry.

That night, C.G. called a crisis center and explained what A.B. had said. A crisis center worker took the information and told C.G. to contact a social worker, which she did the next morning. C.G. then contacted the Duluth police and arranged for a police interview with A.B. at the First Witness house in Duluth. First Witness is a home in Duluth that provides a child-friendly atmosphere where police interview child sexual abuse victims. Specific interview techniques are employed by officers with the goal of obtaining an interview free of suggestion or outside influence.

During this time, Dan and C.G.'s relationship had been deteriorating. The two fought, and the children occasionally witnessed these fights. At trial, C.G. acknowledged that the fights affected the children. In January 1998, C.G. moved out of Dan's house and took A.B. to live with her.

On January 20, 1998, Officer Scott Voigt conducted an interview with A.B. at First Witness. A.B. went to the First Witness house with her mother and Cheryl, but only Voigt and A.B. were present while the interview was conducted. Voigt and A.B. discussed the difference between good touches and bad touches, and when asked if she had ever received a bad touch, A.B. explained that her grandpa had touched her "butt." A.B. said that Vick had touched her butt on two different occasions. The first occasion occurred at the Cook County cabin ("under-the-clothes touching"), and was the sole basis for the charge against Vick and his ultimate conviction. The second instance occurred at Vick's "shop," his place of work in Beaver Bay, Lake County ("over-the-clothes touching"). When describing the Cook County, under-the-clothes touching, A.B. explained that while she and her brother J.V. were sleeping on the bed, Vick—who was sleeping on the floor close to them—woke up and put his hand under her pajamas and rubbed her butt for a "couple of minutes." A.B. said that she pretended to sleep while Vick touched her, and that the touching made her feel mad. Voigt asked A.B. whether Vick had touched her vagina at that time and, during the First Witness interview, A.B. said that he had not.

A.B. also described to Voigt a second instance when Vick touched her "butt." A.B. explained that, while at Vick's shop in Lake County, she was sitting down making a picture when Vick came up behind her, put his hand under her butt, and rubbed her for a couple of minutes. During this touching, A.B. stated that Vick touched her over her clothes, and she again denied being touched on her vagina.

Immediately after leaving the First Witness interview, A.B. told C.G. and Cheryl that she had forgotten to tell Voigt everything. At trial, the state asked C.G. what A.B. said:

> Q. At some point on the way home [from the First Witness interview] or shortly thereafter, did [A.B.] tell you that she'd forgotten something?
>
> A. We hadn't even gotten to lunch yet. We were pretty much just pulling out of the office and we had asked [A.B.] how everything went. And she had told us that she had forgotten to tell them things. She had forgotten to tell them some stuff.
>
> Q. Did she tell you what she had forgotten to tell them?
>
> A. Yes.

Q. What did she tell you that she said she had forgotten to tell in the interview?

A. She had told me that there was another incident at Ed's work where she was sitting on his lap and he was helping her with the computer and he had put his hands down her panties.

Q. Did she tell you anything else that she'd forgotten?

A. No.

Vick's attorney made no objection, but Vick now challenges the admission of this testimony on the grounds that it is unnoticed and unproven *Spreigl* evidence. In contrast, the state claims in its brief to this court that C.G.'s testimony was merely a "misstatement," speculating that she wrongly described the Lake County, over-the-clothes touching. The record does not resolve this factual ambiguity. It is the sort of ambiguity that could have been clarified through questioning of the witness. In the absence of clarifying testimony, the attempts by respective counsel to resolve the ambiguity are futile.

C.G. contacted the police after A.B. explained that she had not told Voigt everything. A second follow-up interview was arranged with the Chief Deputy of the Cook County Sheriff's Department, Mark Falk. On March 3, 1998, Falk went to C.G.'s house to interview all the witnesses involved in the case and he was told that A.B. had information to add. This time A.B.'s mother was in the room during the interview. Falk asked A.B. what she left out of the first interview, and Falk testified that before she responded, C.G. said "you've got to tell him." A.B. then explained that on the occasions when Vick had touched her, he did touch her vagina and that it happened "two to four times." When cross-examining Falk, Vick's attorney clarified that A.B. told Falk that only the Cook County incident occurred under her clothes.[2]

As part of the investigation, Officer Voigt asked C.G. if he could set up and tape-record a phone conversation between A.B. and Vick. C.G. declined, fearing the effect on A.B., but indicated that she herself would call Vick. C.G. called, the conversation was recorded, and the tape was ultimately played for the jury. During the call, C.G. told Vick about A.B.'s claim that Vick touched her. Vick responded: "Oh geez. God, with all that wrestling going on, anything could be touched but it's not on purpose, I guarantee you that." Vick denied touching A.B. while she slept. While talking with Vick, C.G. also mentioned that A.B. talked of another time when Vick touched her, this time at his shop: "She loves you and so do I and I just wanted to call and talk to you and find out, you know * * * because she mentioned to me that when she was at the shop and she was playing on the computer that you'd put your hand *down her panties.*" (Emphasis added.) Vick did not object to the admission of this tape.

Vick was charged with second-degree criminal sexual conduct in violation of

---

2. At trial, Falk testified:

Q. And then at the top of page six, you said, did he touch the vagina at the shop. The answer is yes. Was that over the clothes or underneath the clothes. Answer, over the clothes.
A. Correct.
Q. And she said that she was sitting on his lap when that happened.
A. Correct.

Q. Did anybody after this interview call you back and say that she has now said that he put his hand underneath her panties at the shop?
A. It seems to me that there's [been] something mentioned about that but I don't recall who has made that statement.
Q. And you don't have that in any of your reports?
A. No. Not that I can recall.

Minn.Stat. § 609.343, subd. 1(a).[3] The charge was based exclusively on the December in-bed touching alleged to have occurred in Cook County. Prior to trial, Vick received a *Spreigl* notice informing him of the state's intention to use evidence of the over-the-clothes touching that occurred at his Lake County shop.[4]

At trial, A.B. testified that she could not remember the touching events, but testified that she had told the truth in the taped interview at First Witness. Before playing the tape for the jury, the judge explained:

> Ladies and Gentlemen, at this time we're going to watch * * * a video tape that [Office Voigt] has been talking about or testifying to. * * * Ladies and Gentlemen, * * * on the video tape, you will hear some evidence or some statements about incidents occurring at other times and other places. Most specifically about an incident occurring in Beaver Bay [Lake County] in December of 1997.

> It is important that you understand that Mr. Vi[c]k is not being tried for and may not be convicted of an offense other than the offense that he's charged with here, which is an incident that is alleged to have occurred in December of 1997 in the Christine Lake area of Cook County. You are instructed specifically that you are not to base any conviction on the basis of any occurrences that occurred at other times or places, including specifically what you'll hear a little bit about on this tape, an incident which allegedly occurred in Beaver Bay in Lake County.

The jury heard the taped interview in its entirety. As a result, the jurors heard evidence of both the charged under-the-clothes touching and the touching at the Lake County shop. The Lake County over-the-clothes touching was admitted either "to illuminate the relationship" between A.B. and Vick or as properly noticed *Spreigl* evidence.[5] Vick did not object at

---

**3.** Minnesota Statutes § 609.343, subds. 1 and 1(a), state:

> A person who engages in sexual contact with another person is guilty of criminal sexual conduct in the second degree if any of the following circumstances exist:
>
> (a) the complainant is under 13 years of age and the actor is more than 36 months older than the complainant. Neither mistake as to the complainant's age nor consent to the act by the complainant is a defense. In a prosecution under this clause, the state is not required to prove that the sexual contact was coerced.

**4.** The *Spreigl* notice stated:

> PLEASE TAKE NOTICE that the [state] * * * will introduce evidence of other offenses within the meaning of Rule 7.02 of the Rules of Criminal Procedure at the Trial of this matter. That the other offenses occurred in Lake County at the Defendant's work shop in or near Two Harbors, MN and that such other offense constitutes evidence of prior conduct within the meaning of M.S. § 634.20. It is the position of the

prosecution that this evidence of prior conduct is not within the meaning of the Spreigl Rule referred to as Rule 7.02 * * * however this Notice is given in order to obviate any potential argument that it is within said Rule. That evidence is set forth in detail in the statements and reports provided to the Defendant and is referred to in the Complaint as "touching over her clothes" that occurred in Lake County.

**5.** The record is not clear as to whether the trial court admitted the Lake County over-the-clothes evidence as other-crimes *Spreigl* evidence or as "relationship evidence." *See generally State v. Salas*, 306 N.W.2d 832, 836 (Minn.1981) (noting that where evidence bears directly on the history of the relationship between the defendant and the victim, the state is not required to follow the *Spreigl* rule as a condition of getting the evidence admitted). In any event, Vick was well aware of this evidence before trial and of the state's intention to use it because it was described in the complaint and because Vick had received a *Spreigl* notice in connection with the evidence.

trial to the admission of this evidence, nor does he challenge it now.

The state elicited testimony at trial to corroborate A.B.'s complaint. C.G. and Cheryl testified that, after the touching, A.B. became shy about her body and about being seen naked; she began to neglect personal hygiene and then to lie about it.[6] Vick's attorney asked C.G. questions about A.B.'s lying behavior and specifically asked whether, in the course of seeing a therapist from Lutheran Social Services, they ever discussed A.B.'s lies. In response, C.G. stated: "She told me at that time that many times after children have gone through the experience of being touched or what not, that lying is not out of the ordinary for them to do." Vick's attorney did not object to this response.

Vick and Dan testified in Vick's defense. Vick testified that he had a good relationship with A.B. He testified that on no occasion, including the night the children stayed at his cabin, did he touch A.B. in a sexual manner, touch her buttocks, or put his hand under her pants. Dan testified that his relationship with C.G. began to deteriorate in October 1997 and that they had arguments in front of the children. In response to questions from Vick's attorney, Dan also testified that in March 1999, prior to the trial when Ed was not permitted to see A.B., Dan had the children at his house one day and Vick stopped over.

Dan and his wife were in the bedroom and the children were in the living room. Vick knocked and J.V. yelled "come in." Vick walked into the living room, and A.B. went into the bedroom to explain that grandpa was there. Dan testified that A.B. did not seem upset at seeing Vick, but was surprised. On cross-examination, however, Dan admitted that after the visit to Vick's cabin, A.B. expressed fear about seeing Vick.[7]

In closing arguments, Vick's attorney outlined the weaknesses in the state's case. He reminded the jury that A.B.'s accusations arose at a time of high stress, explaining that her parents' fighting caused turmoil and theorizing that this may have led to separation anxiety. He reminded the jury about A.B.'s "lying conduct" and discussed the inconsistent progression of A.B.'s allegations, beginning with accusations of buttocks touching and culminating with allegations of vaginal touching. Finally, he raised questions about the reliability of A.B.'s allegations, noting that decreased reliability can result when an allegedly abused child has a series of discussions about the abuse with many different people. The state, on the other hand, discussed the consistencies in A.B.'s allegations and the corroborating evidence. It argued that A.B. probably did not reveal the whole story from the start because, as she told C.G. and Cheryl,

6. On direct examination, Cheryl testified:
 Q. How was [A.B.] with respect to taking her clothes off to take a shower and being embarrassed about her body, that sort of thing?
 A. Prior to the incident?
 Q. Prior to the incident.
 A. Fine. She had no problem with it. If she had, you know, an owie on her butt, she'[d] show me.
 Q. How about after the visit with Grandpa Ed?
 A. No, no. She doesn't want—she wants absolutely no one to see her without clothes on. We're having trouble with her brushing her teeth, combing her hair, personal hygiene. She doesn't want to do any of that kind of stuff. And before we'd wash her hair and put in ponytails and braids and now we're lucky to get a comb through it.

7. Dan testified that while on a car trip that led in the same direction as Vick's cabin, A.B. asked with worry "we're not going to grandpa's, are we?"

she did not want to get her grandpa in trouble.

The jury found Vick guilty of second-degree criminal sexual conduct in violation of Minn.Stat. § 609.343, subd. 1(a).[8] Before the sentencing, Vick petitioned for postconviction relief, alleging ineffective assistance of trial counsel and insufficiency of evidence. After sentencing him to a stayed sentence of 21 months, contingent on his serving one year in prison, ten years probation, and participating in a sex offender program, the district court denied Vick's petition. Vick then appealed his conviction and the postconviction court's denial of his petition.

Vick made three arguments to the court of appeals. First, he argued that he was denied a fair trial when the trial court admitted C.G.'s alleged *Spreigl* testimony because it was "uncharged, unnoticed and unproven *Spreigl* evidence." Second, Vick argued that the postconviction court abused its discretion in denying his petition for postconviction relief based on allegations of ineffective assistance of counsel. Finally, Vick challenged the sufficiency of the evidence supporting his conviction.

The court of appeals reversed Vick's conviction and remanded for a new trial. *Vick*, 2000 WL 890468, at *3. The court held that it was plain error for the trial

court to admit the purported *Spreigl* evidence without the necessary *Spreigl* safeguards and that the error affected Vick's substantial rights and was prejudicial to the outcome of the case. *Id.* Because it ordered a new trial on this basis, the court did not address Vick's other arguments.

## I. C.G.'s Testimony

■■■ Vick urges us to affirm the court of appeals' holding that the trial court committed plain error when it admitted, without adherence to the *Spreigl* procedural requirements,[9] C.G.'s testimony that A.B. told her Vick had touched A.B. "down her panties" at his Lake County shop. Vick's challenge is not to the Lake County shop incident in its entirety, but to the mother's description of this (or some other—the record is unclear) episode as having been "down the panties." No objection was made at trial to this testimony or, for that matter, to the over-the-clothes testimony, and so it is not clear whether the trial court admitted it as other-crimes (*Spreigl*) evidence or as relationship evidence. The district court in its postconviction order referred to it as *Spreigl* evidence, and we will treat it that way as well.

■■■ Vick did not object to C.G.'s testimony at trial. Failure to object to the admission of evidence generally constitutes waiver of the right to appeal on that basis.

8. A person is guilty of second-degree criminal sexual conduct if he engages in sexual contact with a complainant who is "under 13 years of age and the actor is more than 36 months older than the complainant." Minn.Stat. § 609.343, subd. 1(a). Sexual contact for purposes of this provision requires touching the genital area, groin, inner thigh, buttocks, or breast, *either under or over the clothing*, with sexual or aggressive intent. Minn.Stat. § 609.341, subds. 5, 11(a), 11(a)(i), and 11(a)(iv) (2000).

9. In order to admit other-crimes evidence in Minnesota, several safeguards must first be satisfied. Those safeguards are: (1) notice is

given that the state plans to use the evidence, (2) the state must clearly indicate what the evidence is offered to prove, (3) the evidence is clear and convincing evidence that the defendant participated in the other offense, (4) the other-crimes evidence is relevant and material to the state's case, and (5) the probative value of the evidence is not outweighed by potential for unfair prejudice. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998); *State v. Bolte*, 530 N.W.2d 191, 196–97 (Minn. 1995); see *State v. Spreigl*, 272 Minn. 488, 496–97, 139 N.W.2d 167, 173 (1965). These safeguards are often referred to as the Spreigl requirements.

*State v. Bauer,* 598 N.W.2d 352, 363 (Minn. 1999). However, an appellate court may consider a waived issue if there is (1) error, (2) that is plain, and (3) the error affects the defendant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). To satisfy the third prong, a defendant bears a "heavy burden" of persuasion to show that "the error was prejudicial and affected the outcome of the case." *Id.* at 741. If these three prongs are met, the court must then decide whether it should address the issue in order to "ensure fairness and the integrity of the judicial proceedings." *Id.* at 740. Only after all these factors are satisfied may an appellate court exercise its discretion to correct an unobjected-to error. *Id.; see Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (describing the plain error test, which the Minnesota Supreme Court adopted in *Griller* ). For the following reasons, we reverse the court of appeals' decision and hold that the trial court did not commit plain error.

While Vick complains on appeal that C.G.'s testimony was admitted, the record does not demonstrate that the trial court was given any advance opportunity to consider the admissibility of C.G.'s testimony; the record reveals no pretrial motion or objection about the testimony and contains no transcript of an omnibus hearing. Accordingly, the question before us is *not* whether the trial court erred in admitting the testimony, because the court was not given the opportunity to make that decision. Instead, the precise question before us is whether the trial court's failure to sua sponte strike the testimony or to provide a cautionary instruction constituted plain error. The *Spreigl* notice was never made part of the record before the trial court, nor do the rules of criminal procedure require the notice to be made part of the record. Minn. R.Crim. P. 7.02. In the absence of an objection, then, we are hard pressed to see how the trial court could be attuned to whether C.G.'s testimony exceeded the scope of the *Spreigl* notice. Thus, there was no reason for the trial court to intercede sua sponte and, as a result, the trial court did not err in not striking C.G.'s testimony.

▊ Furthermore, while trial courts are advised, even absent a request, to give a cautionary instruction upon the receipt of other-crimes evidence, failure to do so is not ordinarily reversible error. *State v. Frisinger,* 484 N.W.2d 27, 31 (Minn.1992) ("While the trial court clearly should have given the instructions sua sponte and while it is conceivable that a case may arise where the facts are such that a failure to give these instructions sua sponte may constitute plain error of a prejudicial nature requiring * * * a new trial, we find that a new trial is not required in this case."); *see State v. Williams,* 593 N.W.2d 227, 237 (Minn.1999) ("[A]lthough the failure to give limiting instructions [in connection with the admission of relationship evidence] in certain circumstances may constitute plain error, we hold that it does not do so in this case."). In these circumstances, where C.G.'s testimony was an ambiguous description of what may or may not have been a separate *Spreigl* incident and where no objection was made to that testimony, any error resulting from the trial court's decision not to intercede was not plain. For this reason, we are not compelled to depart from the rule that a trial court's failure to sua sponte strike unnoticed *Spreigl* evidence or provide a cautionary instruction is not ordinarily plain error.

Even if there was an error, though, Vick cannot satisfy his heavy burden under the third prong of the plain error test because he cannot show that the error was so

prejudicial as to have affected the outcome of the case. As in *State v. Williams*, there are several factors here that reduce the likelihood that the testimony unfairly infected the trial. 593 N.W.2d at 237. The Lake County over-the-clothes testimony was properly introduced, without objection. In connection with that testimony, the court twice provided an appropriate cautionary *Spreigl* instruction: once before playing the First Witness tape and again during the jury charge. Additionally, the court provided a broader instruction: "It is important that you understand that Mr. Vi[c]k is not being tried for and may not be convicted of an offense other than the offense that he's charged with here, which is an incident that is alleged to have occurred in December of 1997 in * * * Cook County." In fact, the trial court instructed the jury that Vick could not be convicted based on "any occurrence in * * * Lake County on or about December of '97." Assuming, as we do, that the jury followed the court's instructions, the effect of this instruction was to prohibit the jury from convicting Vick based on *any* description of *any* alleged touching occurring in Lake County. *See State v. Shoen*, 578 N.W.2d 708, 718 (Minn.1998).

Next, although C.G.'s testimony described the Lake County incident as occurring under the clothes, or at least "down her panties," Vick did have notice of the state's intention to use other-crimes evidence against him. Because he could anticipate the state's impending other-crimes evidence, albeit in the form of "over-the-clothes" testimony, the potential for prejudice was minimized; the broader theme of the other-crimes evidence came as no surprise to Vick. *See State v. Volstad*, 287 N.W.2d 660, 662 (Minn.1980) (holding that the admission of unnoticed *Spreigl* evidence was not error, even though one of the prior crimes brought out at trial was not mentioned in the *Spreigl* notice, be-

cause: (1) the defendant did not specifically raise the issue at trial; (2) the incident was specifically mentioned in the complaint; and (3) the incident was part of a broader incident for which *Spreigl* evidence was provided); *see also State v. Bolte*, 530 N.W.2d at 198–99 (noting that wrongly-admitted *Spreigl* testimony did not affect the verdict and thus did not require a new trial when, among other things, "other other-crime evidence was properly admitted"). Moreover, Vick was on trial for under-the-clothes genital touching and the additional incident was not more inflammatory than the charged incident. In fact, Minn.Stat. § 609.343, subd. 1(a), can be violated by over *or* under the clothes touching—the statute makes no distinction in degree between over- and under-the-clothes touching. Minn.Stat. § 609.341, subds. 5, 11(a), 11(a)(i), 11(a)(iv). In addition, both incidents were subject to identical impeachment because they involved the same child. The potential for prejudice was also reduced because the state did not rely on C.G.'s alleged *Spreigl* testimony during closing arguments. *See Bolte*, 530 N.W.2d at 198.

Furthermore, when Vick's attorney cross-examined Chief Deputy Falk, Falk clarified that the child herself consistently described the incident at Vick's shop only as an over-the-clothes touching. This clarification minimized the potential prejudice that may have resulted from C.G.'s testimony. Finally, the alleged *Spreigl* testimony did not prejudice Vick's case given his theory of defense. *See State v. Bauer*, 598 N.W.2d 352, 364 (Minn.1999). In *State v. Bauer*, we held that the admission of an expert's testimony stating that he believed the defendant intended to kill the victim was not plain error, in part because the defendant's theory of defense was not affected by the admission. *Id.* at 363–64.

Specifically, the defendant in *Bauer* never argued that the killing was unintentional, but rather argued that he was not the person who committed the murder. *Id.* Similarly, Vick never argued that he only touched A.B. over the clothes, nor would it matter given the statute under which he was convicted;[10] he argued that he never touched A.B. in a sexual manner.

The dissent concludes that the trial court committed plain error because, among other things: there was no clear and convincing evidence that the event as C.G. described it ever occurred; C.G.'s alleged *Spreigl* testimony was not relevant or material to the case; and as the question here is a close one, the "benefit of the doubt must be given to Vick." Had the trial court been given an advance opportunity to consider C.G.'s testimony and then had a chance to decide whether to admit or suppress it, the concerns raised by the dissent would have played a part in our analysis as well. However, neither the dissent nor the court of appeals identifies a basis in the record for the tacit conclusion that the trial court had reason to know that C.G.'s testimony went beyond the notice given to the defense. The defense had pretrial access to the tape of the conversation between Vick and C.G.—at least we assume so because the discovery rules require it and there is no allegation of discovery failure. The tape contained the same statement C.G. made at the trial: "down her panties." But discovery, like a *Spreigl* notice, goes to the parties, not to the court.

And so we reiterate that the real question before us is *not* whether the trial court erred in *admitting* the evidence, but instead is whether the trial court's failure to sua sponte strike the testimony or pro-

vide a cautionary instruction was plain error. Approaching *that* question, we must keep in mind the general rule that, ordinarily, a trial court's failure to sua sponte strike or instruct is not reversible error. *See, e.g., Williams*, 593 N.W.2d at 237 ("While a trial court should generally still provide [a limiting instruction] sua sponte to ensure that the [other-crimes] evidence is not used for an improper purpose, the failure to provide limiting instructions absent a request is not reversible error."). We must also bear in mind that, having failed to challenge this testimony at trial, Vick must show plain error and must satisfy the heavy burden of proving that the outcome of his case was affected by the trial court's failure to strike or provide an instruction. *Griller*, 583 N.W.2d at 741–42. We cannot agree that this one statement, whether it was a misstatement, unnoticed and unproven *Spreigl* evidence, or an accurate description of A.B.'s words to her mother, which was never again referred to by the state, affected the jury's decision to convict. *See Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring) ("In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure.").

Because we hold that the trial court did not commit error, plain or otherwise, in failing to strike C.G.'s alleged *Spreigl* testimony or provide a separate cautionary instruction in connection with it, the court of appeals' decision is reversed.

## II. Ineffective Assistance of Trial Counsel

■ Vick contends that he is entitled to a new trial because he was denied effective

---

**10.** Minnesota Statutes § 609.341, subdivisions 11(a) and 11(a)(iv), state that sexual contact for purposes of Minn.Stat. § 609.343 includes "touching of the clothing covering the immediate area of the intimate parts."

assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Vick raised his ineffective assistance claim prior to his direct appeal. After holding an evidentiary hearing, the postconviction court denied Vick's petition.

A postconviction court's decision is reviewed for abuse of discretion, and Vick bears the burden of showing that the court abused that discretion. *State v. Doppler*, 590 N.W.2d 627, 632–33 (Minn. 1999). To prove ineffective assistance, Vick must show that his "counsel's performance was deficient and that this deficient performance deprived [him] of a fair trial." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn. 1998). The first prong of the test, deficiency, requires a defendant to show that counsel's performance fell below an objective standard of reasonableness. *Id.* Courts presume, however, that counsel's performance fell within the "wide range of 'reasonable professional assistance.'" *Id.* (quoting *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986)). Further, appellate courts do not review matters of trial strategy for competency. *Doppler*, 590 N.W.2d at 633. The second prong of the test, prejudice, requires a defendant to show by a preponderance of the evidence that counsel's errors so prejudiced the case that a different outcome would have resulted but for the errors. *Id.*

Vick first alleges that during closing arguments his attorney conceded his guilt without consent. This accusation, if true, could warrant a new trial. *State v. Wiplinger*, 343 N.W.2d 858, 861 (Minn.1984) ("[W]e generally believe that if a defense counsel impliedly admits a defendant's guilt without the defendant's permission or acquiescence, the defendant should be given a new trial even if it can be said that the defendant would have been convicted in any event."). In *Wiplinger*, the defendant was tried for kidnapping and first-

degree criminal sexual conduct involving a ten-year-old girl. 343 N.W.2d at 859. When cross-examining the victim, the defendant's attorney asked questions like: "Throughout all of this, Mr. Wiplinger didn't threaten you in any way, did he? * * * * And Mr. Wiplinger didn't really use any kind of force on you, did he?" *Id.* Underlying these questions was the clear assumption that Wiplinger did have sexual contact with the victim.

Compared to the questions in *Wiplinger*, the comments about which Vick complains, taken in context, do not rise to the level of an implied admission:

We all talked about the presumption of innocence when we started out and every one of you folks said, yes, that's the law, I will follow it. *Now, if you assume that Mr. Vi[c]k is guilty, then the arguments of [the prosecutor] make perfect sense. Because then all you have to do is say, well, I'm assuming he's guilty, let me look for a piece of evidence that supports that. And then you can find some evidence that supports that.* But of course you've taken an oath that you will follow the law. And the law says you have to presume him innocent until the State has proved the case beyond a reasonable doubt. And they couldn't do that in this case for reasons we're going to talk about but for reasons I'm sure you're going to talk about more in the jury room.

(Emphasis added to highlight the comments about which Vick complains.) Nothing in these statements would lead a reasonable person to conclude that Vick's attorney admitted Vick's guilt. Because Vick's attorney's comments, viewed in context, do not constitute a confession, a new trial is not warranted on this basis.

Vick next argues that the cumulative effect of numerous errors by his attorney deprived him of effective counsel.

Vick complains of the following errors: (1) failure to vigorously cross-examine A.B. or impeach C.G.; (2) failure to object to expert testimony involving vouching for A.B.'s credibility; and (3) failure to object to the alleged *Spreigl* evidence. All of the alleged errors in this case involve matters of trial strategy, which are not reviewed for competency. *State v. Voorhees*, 596 N.W.2d 241, 255 (Minn.1999) ("What evidence to present to the jury, including which defense to raise at trial and what witnesses to call, represent an attorney's decision regarding trial tactics which lie within the proper discretion of trial counsel and will not be reviewed later for competence."); *see Brocks*, 587 N.W.2d at 43 (concluding that a defense attorney's decision not to cross-examine several state witnesses was a reasonable trial tactic). Therefore, Vick's ineffective assistance claim fails.

Even if these alleged errors were reviewable, Vick has not shown that his attorney's actions were not objectively reasonable. For instance, Vick complains that his attorney did not effectively cross-examine A.B. about her different accounts of the abuse. He argues that in sexual abuse cases the jury's verdict turns on who they believe and therefore it was crucial to attack A.B.'s credibility. In his closing argument, Vick's attorney explained his reasons for not aggressively questioning A.B.: he "did not want to make it any more difficult than it was for her," and therefore he "didn't ask her ver[y] many questions." This decision was reasonable in order to avoid creating sympathy for A.B. and hostility toward Vick or his attorney. Similarly, the decision not to attempt to impeach C.G. about a romantic "interest" she had before the end of her relationship with Dan was reasonable. Even if Vick's attorney had asked C.G. whether she had developed a romantic interest outside her relationship with Dan, he would

have had to live with any denial because he could not use extrinsic evidence of this collateral matter to impeach. *State v. Ferguson*, 581 N.W.2d 824, 833–34 (Minn. 1998). Additionally, he risked alienating the jury with any attempt to impeach C.G. with this unrelated information. *Cf. Brocks*, 587 N.W.2d at 43 ("His counsel might well have concluded that the jury would be alienated if he cross-examined the grieving mother about information not critical to the case.").

Vick also argues that his attorney was ineffective because he failed to object to C.G.'s testimony regarding the therapist's comment that "lying is not out of the ordinary" for children who have experienced sexual abuse. Vick claims that this testimony was improper expert vouching because it reflected the therapist's belief that A.B. was sexually touched.

It is well settled that one witness may not "vouch for or against the credibility of another witness." *State v. Ferguson*, 581 N.W.2d at 835. More specifically, "[a]s a general rule * * * we would reject expert opinion testimony regarding the truth or falsity of a witness' allegations about a crime, for the expert's status may lend an unwarranted 'stamp of scientific legitimacy' to the allegations." *State v. Myers*, 359 N.W.2d 604, 611 (Minn. 1984). In *Myers*, we permitted expert testimony describing commonly observed psychological and emotional characteristics in sexually abused children, and testimony describing those characteristics specifically observed in the victim, in order to provide background and insight into the behavior of child sexual abuse victims. *Id.* at 610–11. Similarly, the therapist's statement in this case was a comment on the general characteristics of abused children and therefore not vouching. *Id.; see Powell v. State*, 714 N.E.2d 624, 629 (Ind.1999)

(holding that a police officer's testimony that it is not unusual for crime victims or witnesses to be reluctant to come forward and talk with the police was not impermissible vouching testimony); *State v. Geyman*, 224 Mont. 194, 729 P.2d 475, 479 (1986) (holding that expert testimony commenting on the veracity of child sexual abuse victims is admissible to help the jury assess the credibility of a child sexual assault victim). Because this testimony was not vouching testimony, Vick's attorney made a reasonable decision not to object on that basis.

 Finally, Vick complains that his attorney prejudiced his case when he failed to object to the alleged *Spreigl* testimony. This decision was a reasonable tactical decision because any objection may have highlighted that, although the Lake County incident may have involved touching over the clothes, the Cook County incident for which Vick was convicted did involve *under*-the-clothes touching. *Cf. Doppler*, 590 N.W.2d at 635 (concluding that an attorney's decision not to focus on intoxication as a defense and failure to request an intoxication jury instruction was a matter of trial strategy); *State v. Eling*, 355 N.W.2d 286, 293 (Minn.1984) (stating that an attorney's decision not to request a cautionary instruction "regarding the possibility of defendant's appearing in handcuffs in view of the jurors" was a tactical decision that probably reflected the attorney's attempt to avoid calling further attention to the defendant's restraints).

Even if there was an error, Vick cannot show that the outcome of his case would have been different without the error. *See Doppler*, 590 N.W.2d at 633. When cross-examining Chief Deputy Falk, Vick's attorney clarified that A.B. always described the Lake County shop touching as occurring over-the-clothes. This clarification,

the fact that the judge twice gave cautionary instructions with regard to the use of other-crimes evidence, and the fact that the crime for which Vick was convicted did occur under the clothes all minimize the possibility that prejudice resulted.

In short, we conclude that Vick did not receive ineffective assistance of counsel and is not entitled to a new trial on that basis.

### III. Sufficiency of the Evidence

 Vick argues that the evidence presented at trial was insufficient to support his conviction for second-degree criminal sexual conduct and therefore his conviction must be vacated. When considering a sufficiency of the evidence challenge, we review the evidence presented at trial to determine whether the jury could reasonably have found the defendant guilty of the crime charged. *State v. Folkers*, 581 N.W.2d 321, 326 (Minn.1998). A defendant bears a heavy burden to overturn a jury verdict. *State v. Bowser*, 305 Minn. 431, 437, 234 N.W.2d 890, 893 (1975). On review, we must view the evidence in the record in the light most favorable to the jury's verdict and assume that the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Dale v. State*, 535 N.W.2d 619, 623 (Minn.1995); *Bowser*, 305 Minn. at 437, 234 N.W.2d at 893.

Vick was convicted under Minn.Stat. § 609.343, subd. 1(a), which provides that a person is guilty of second-degree criminal sexual conduct if he engages in sexual contact with a victim who is "under 13 years of age and the actor is more than 36 months older than the complainant." Sexual contact for purposes of this provision requires touching the genital area, groin, inner thigh, buttocks, or breast, either under or over the clothing, with sexual or aggressive intent. Minn.Stat. § 609.341, subds. 5, 11(a), 11(a)(i), and 11(a)(iv).

Vick argues that the evidence at trial was not sufficient to demonstrate that the touching occurred with any sexual or aggressive intent. He claims that the touching of A.B.'s buttocks, without more, does not permit the jury to infer sexual intent.

Assuming, as we must, that the jury believed the state's witnesses, evidence demonstrated that Vick touched A.B.'s buttocks on at least two occasions, once over the clothes and once under the clothes, and that on each occasion he rubbed her buttocks for a couple of minutes. The jury also heard from Chief Deputy Falk that Vick touched A.B.'s vaginal area between two and four times. Evidence was presented about A.B.'s abrupt change in behavior following the Cook County in-bed, under-the-clothes touching and about A.B.'s subsequent fear of visiting Vick. A.B. told several different people about the touching (C.G., Dan, Cheryl, Joshua, Officer Voigt, and Chief Deputy Falk), and although she did not reveal the entire story from the beginning, she never deviated from her basic position. As the jury watched the video interview with A.B., they could witness her demeanor and body language as she was asked detailed questions about the touching.

In *State v. Kraushaar*, a defendant challenged the sufficiency of the evidence sustaining his second-degree criminal sexual conduct conviction, arguing that the state failed to prove that he acted with sexual intent. 470 N.W.2d 509, 511–12 (Minn. 1991). In *Kraushaar*, the five-year-old victim told her mother, her foster parent and a pediatrician that her daddy had touched her vagina and that he "French kissed" her. *Id.* at 510–12. The jury heard testimony that: (1) the victim told her story to several adults; (2) she was "very sexually precocious for her age"; (3) an expert explained that some of the child's drawings were very indicative of

abuse; and (4) no medical evidence corroborated the allegations, but that was not inconsistent with the victim's story. *Id.* at 511–12. The defendant denied touching his daughter with sexual intent and explained that he only touched her in the genital or buttocks area in the course of ordinary care-giving activities, like bathing. *Id.* at 511. We held that the evidence was sufficient to support the conviction. *Id.* at 513.

In A.B.'s case, like in *Kraushaar*, the primary evidence against Vick is A.B.'s word and evidence of behavioral change. Vick argues that mere evidence of rubbing A.B.'s buttocks, without more, does not demonstrate sexual intent. However, the nature of the touching here, specifically the two instances of rubbing A.B.'s buttocks both over and under the clothes for minutes at a time accompanied by vaginal touching, negates the possibility of an innocent explanation such as accidental touching or touching in the course of care-giving. The touching described by A.B. during her interviews with Officer Voigt and Chief Deputy Falk clearly permits the inference that Vick touched A.B. with sexual intent. *E.g., id.* at 511–13; *Myers,* 359 N.W.2d at 606–08 (finding sufficient evidence to support a conviction for second-degree criminal sexual conduct where the victim stated that the defendant "did things to her like he did to her mother," touched her on her "chest" and between her legs); *see State v. Crego,* 395 N.W.2d 140, 141 (Minn.App.1986) (holding that sufficient evidence supported a conviction for second-degree criminal sexual conduct when the victim awoke to find the defendant rubbing his hand under her panties and stating "[y]ou're getting older"). Therefore, we conclude that the evidence at trial was sufficient to permit the jury to convict Vick of second-degree criminal sexual conduct.

Reversed.

PAUL H. ANDERSON, J. (dissenting).

I respectfully dissent from the majority's approval of the admission of C.G.'s testimony about under-the-clothes touching. C.G.'s testimony, which falls into the category of *Spreigl* evidence, was admittedly a misstatement.[1] For this reason and others, the statement falls short of the standards that we have set for the admission of *Spreigl* evidence. Therefore, I conclude that the admission of this testimony was plain error affecting appellant Edwin Olaf Vick's substantial rights.

I agree with the majority's conclusion that we must look at this case by conducting a plain error analysis. Vick did not object to the testimony or seek a limiting instruction. Therefore, we may consider the issue only if there is plain error. For there to be plain error, there must be "(1) error; (2) that it is plain; and (3) the error must have affected substantial rights." *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). When these three prongs are present, we then assess whether we "should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.; see* Minn. R.Crim. P. 31.02. We have given direction as to how we proceed with such analysis in *State v. Pilot*, where we said:

> [T]he trial error must have been so clear under applicable law at the time of conviction and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object—and thereby present the trial court with an opportunity to avoid prejudice—should not forfeit his right to a remedy.

*State v. Pilot*, 595 N.W.2d 511, 518 (Minn. 1999) (quoting *Rairdon v. State*, 557 N.W.2d 318, 323 (Minn.1996)).

A district court has the discretion to admit evidence of other crimes evidence—also known as *Spreigl* evidence—but the court must ensure that certain safeguards are met before admitting such evidence so that the *Spreigl* evidence does not wrongly remove reasonable doubt in the jury's mind as to the defendant's guilt. *State v. Spreigl*, 272 Minn. 488, 495–97, 139 N.W.2d 167, 172–73 (1965) (citing to *State v. Doty* for the proposition that "The danger of it [evidence of other offenses] is that a jury may convict because, though guilt of the crime charged is not proved, it is satisfied to convict because of other crimes." 167 Minn. 164, 166, 208 N.W. 760, 761 (1926)). *Spreigl* evidence is admissible for the legitimate purpose of establishing motive, intent, absence of mistake, identity, or common scheme or plan. *State v. DeWald*, 464 N.W.2d 500, 502–03 (Minn.1991).

To admit the other crimes or bad acts evidence referred to as *Spreigl* evidence, a court must find that (1) the state gave notice that it intended to use the evidence; (2) the state clearly indicated what the evidence was intended to prove; (3) the evidence that the defendant participated in the other offense or bad act is clear and convincing; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the evidence is outweighed by its potential for unfair prejudice. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998). We have held that this type of evidence may be admitted if it is similar to the charged offense in either time, place, or modus operandi. *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). It is not sufficient that the prior crime is simply of the same generic type as the instant offense. Generic relevance is usually insufficient to allow its admission as

---

1. The district court incorrectly categorized the testimony as evidence of a "common scheme or plan" and the first time the state acknowledged that this testimony was a misstatement was at oral argument before the court of appeals.

*Spreigl* evidence. *State v. Cogshell,* 538 N.W.2d 120, 123–24 (Minn.1995). When it is unclear whether *Spreigl* evidence is admissible, the benefit of the doubt should.be given to the defendant and the evidence should be excluded. *Id.*

The admission of *Spreigl* evidence requires at the outset that the state give notice of its intent to use the evidence. Minn. R.Crim. P. 7.02. The purpose of the notice is to give the defendant sufficient opportunity to prepare for trial and to avoid defending against unexpected testimony concerning prior offenses or bad acts. *State v. Bolte,* 530 N.W.2d 191, 197 (Minn.1995). The Minnesota Rules of Criminal Procedure require that notice of "additional offenses shall be described with sufficient particularity to enable the defendant to prepare for trial." Minn. R.Crim. P. 7.02. As the court of appeals said in its opinion here, the "notice serves the purpose of allowing a defendant to candidly assess the likelihood of success before trial and to accept a plea-bargain if it is in the defendant's best interests." *State v. Vick,* No. C7–99–1949, 2000 WL 890468 at *2 (Minn.App. July 3, 2000). Vick was never given the opportunity to weigh the impact of C.G.'s under-the-clothes touching testimony because no notice was provided. The reason for the lack of notice—because the statement was a misstatement—is irrelevant to the determination of whether the notice was proper.

The majority attempts to buttress its position for the admission of this testimony by stating that a *Spreigl* notice was given with respect to a Lake County over-the-clothes touching. The majority further attempts to buttress inclusion of the statement on the grounds that Deputy Falk testified that the Lake County touching was over the clothes and that the judge gave *Spreigl* instructions on the over-the-clothes testimony. I find these reasons to be insufficient to eliminate any prejudice from this testimony that affected the outcome of the case and certainly they are not an adequate basis for admission of this damaging, highly prejudicial evidence.

It was plain error to admit the *Spreigl* evidence which the state concedes was a misstatement because there is no clear and convincing evidence that an under-the-clothes or under-the-panties touching occurred in Lake County as is required for prong three of the *Spreigl* admission test. We have previously stated that evidence that a defendant participated in a prior offense or bad act must be clearly convincing. *Kennedy,* 585 N.W.2d at 389. Here there can be no showing by a preponderance of the evidence that any such incident happened or that the truth of the facts submitted is highly probable.

I also conclude that C.G.'s under-the-clothes touching testimony was not necessary in order to provide the proper context for A.B. having a second interview with the police. *Cf. State v. Czech,* 343 N.W.2d 854, 856–57 (Minn.1984). All that was necessary was for C.G. to testify that A.B. stated some information that was not included in the first interview and for this reason, the second interview was conducted. Admission of this evidence cannot be explained away as a justification for seeking the second interview. When we are dealing with evidence as potentially prejudicial as the evidence here, we must be careful not to overreach to characterize this testimony as anything other than *Spreigl* evidence. Furthermore, it confounds me that the majority could conclude that this misstatement did not affect the jury's decision to convict.

For all of these reasons, I conclude that error occurred in this case and that it was plain error. By failing to sua sponte strike the unnoticed *Spreigl* evidence or to provide a specific cautionary instruction as to

this improper evidence, the district court plainly erred. The majority dismisses my concern about the propriety of the admission of C.G.'s statement because "the question before us is *not* whether the trial court erred in admitting the testimony, because the court was not given the opportunity to make that decision." Rather, the question before us is "the trial court's failure to sua sponte strike the testimony or provide a cautionary instruction * * *." I find it ironic that under the majority's approach, C.G.'s statements, which are at best misstatements and at worst could be deliberate attempts to mislead the jury, are not put to the full *Spreigl* admissibility test. The majority's position has the potential of placing in the hands of an interested witness the ability to circumvent the strict *Spreigl* admission requirements by making damaging "misstatements" about prior bad acts in front of a jury. The majority's emphasis on the distinction between not admitting the statements versus sua sponte striking the statements once they were made is misplaced. For purposes of the analysis here, I see no distinction because the effect of both is the same—the court could and should have prevented the jury from considering the improper information.

The fact that I have concluded that the admission of this evidence is plain error does not end my analysis. There must be a showing on the third prong of the plain error analysis that the error affected substantial rights, that it was so prejudicial that it affected the outcome of the case. Vick bears the burden of persuasion on this prong. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The majority again asserts that there was no prejudicial effect because the state gave notice that the Lake County over-the-clothes touching testimony would be introduced, the judge provided cautionary *Spreigl* instructions twice with respect to the over-the-clothes touching, and Officer Falk testified that the Lake County touching was over the clothes. The majority asserts that this activity with respect to over-the-clothes testimony "minimized" the potential for prejudice and that the over-the-clothes evidence theme gave sufficient notice to Vick so that the under-the-clothes testimony would come as no surprise. Equally problematic is the majority's statement that C.G.'s misstatement "was not more inflammatory than the charged incident."

It is difficult for me to understand the majority's rationale in this regard. As the court of appeals pointed out, there is a wide chasm between *Spreigl* testimony alleging that Vick touched A.B. over her clothes while she was sitting on his lap at his Lake County shop versus testimony alleging Vick was putting his hands down A.B.'s panties. The court of appeals got it right when it said:

> It is common knowledge that accidental, but misperceived, touches can occur over the clothes. We acknowledge that inappropriate touching can indeed occur over the clothing but, in this case, the down-her-panties *Spreigl* testimony was so prejudicial that the jury could not thereafter impartially determine whether the charged touching in Cook County occurred.

*Vick,* 2000 WL 890468 at *3.

I agree with the court of appeals' conclusion that there is a difference between under-the-panties touching and over-the-clothes touching while sitting on a person's lap. I concede that the issue is close, but we have said that when it is unclear whether *Spreigl* evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should not be included. This position reflects our recognition that "threaded through our

precedents dealing with exceptions to the exclusionary rule is a note of concern, admonishing courts against depriving innocent persons of their constitutional right to a fair trial." *Spreigl*, 272 Minn. at 495, 139 N.W.2d at 171. Here, the benefit of the doubt must be given to Vick. The district court should have excluded this misstatement because it so obviously did not meet the standards for *Spreigl* evidence. It was plain error to admit the evidence, and the admission of this evidence so clearly prejudiced the defendant that it needs to be addressed by our court on appeal in order to ensure the fairness and integrity of judicial proceedings.

I would affirm the court of appeals and remand to the district court for a new trial.

GILBERT, J. (dissenting).

I join in the dissent of Justice Paul H. Anderson.