**STATE of Minnesota, Respondent,**

v.

**Richard Dean WIPLINGER, Appellant.**

No. C9–82–1507.

Supreme Court of Minnesota.

Feb. 17, 1984.

Douglas W. Thomson, Thomson & Hawkins, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Richard D. Hodsdon, Beverly Jones Heydinger, Sp. Asst. Attys. Gen., St. Paul, Ste-

phen C. Rathke, Crow Wing County Atty., Brainerd, for respondent.

AMDAHL, Chief Justice.

Defendant was found guilty by a district court jury of charges of kidnapping and criminal sexual conduct in the first degree, Minn.Stat. §§ 609.25, subd. 1(2) and 2(1) and 609.342(a) (1982). The trial court sentenced defendant to an executed term of 54 months in prison, which is the presumptive sentence for the sex offense when committed by a person with a criminal history score of one. Defendant raises a number of issues on this appeal from judgment of conviction. We reverse and remand for a new trial on the ground that defendant's trial counsel impliedly and without defendant's permission admitted defendant's guilt to the jury. Because a new trial is required on this ground, we need not and do not address the other issues raised by defendant on appeal.

On Friday, February 26, 1982, a 10-year-old Brainerd girl was walking home from school when she was stopped by a man who first asked her for directions, then persuaded her to get in his car and talk with him. After the girl got in the car, the man sexually assaulted her.

Police later learned that defendant, who was an insurance salesman, had been in town at the time. The victim subsequently identified defendant's picture in a photographic display. Defendant was arrested on March 4 and incriminating evidence was seized from his car at that time. On March 5 the victim identified defendant in a corporeal lineup. Scientific tests failed to eliminate defendant as the source of semen.

Defendant's privately-retained trial counsel unsuccessfully tried to persuade defendant to plead guilty to the sex charge in exchange for the dismissal of the kidnapping charge and a promise by the prosecutor not to seek an upward sentencing departure.

The victim was the first witness at trial. She positively identified defendant and testified that she had identified him at the lineup. Defense counsel's cross-examination of her was brief. It included the following exchange:

Q. Throughout all of this, *Mr. Wiplinger* didn't threaten you in any way, did he?

A. No.

Q. And when you did the things that you told us about, you didn't resist doing that, did you?

A. No.

Q. And *Mr. Wiplinger* didn't really use any kind of force on you, did he?

A. No.

Q. Besides doing what you have told us that he did, you didn't have any bruises or black and blue marks on your body?

A. No.

Q. In any way did you?

A. No.

Q. You say that when you parted you shook hands, is that right?

A. Yes.

Q. Did you have a sort of friendly feeling toward him?

A. Yah.

Q. So he really wasn't mean to you as such, was he?

A. Yah.

Q. Pardon?

A. No he wasn't; he wasn't mean.

Q. Was he gentle, in fact?

A. Yes.

Q. I suppose this experience bothered you for some time, didn't it?

A. Yes.

Q. You have gotten over it pretty much now?

A. Yah. (Emphasis added).

The victim's grandmother then testified. The following is defense counsel's cross-examination of her:

Q. What kind of instructions did you give [the victim] about responding to strangers?

A. Well, I always told her and instructed her never to ever bother with a stranger if they called her to the car, never go to anyone's car or ever get in and no matter how nice they seemed or anything and she knew that. She, this had never ever happened before.

Q. This was the first time?

A. This was the first time.

Q. Did she ever explain to you why she did it this first time?

A. Well, she figured when he called her to come to the car that he wanted to know where that building was and she figured that maybe he could explain that building and she could probably tell him.

Q. She didn't ever ask him to let her out of the car, did she?

A. Well, she did tell him and kind of emphasized it quite a bit that she had to be home at 3:30.

Q. But she didn't say let me out right now?

A. Well, I don't know if she said that. She didn't say that to me.

Q. So far as you know, and having talked with her, *Mr. Wiplinger* didn't use any real force on her?

A. Well, she said when he was using his finger down there that that hurt her. She says it made her sore.

Q. But there wasn't any violence of any kind?

A. There was no violence.

Q. And you didn't see any black and blue marks on her body?

A. No.

Q. I suppose for that a while both you and [the victim] were upset about this?

A. Really upset, emotionally upset.

Q. But have you both pretty well recovered from that now?

A. Well, [the victim] keeps saying to me, I don't want to talk about it at all. I just like to blot it out of my mind.

Q. But she doesn't seem to be disturbed about it now?

A. Well, she, a child can kind of take things.

Q. Okay.

A. She is trying to adjust to it. (Emphasis added).

A short time later defendant objected to his attorney's representation of him because his cross-examination on the issue of identity "was not very vigorous" but instead was "an amateur job." Defendant complained further that the night before trial defense counsel said he wanted to withdraw because he did not feel he could help defendant. The prosecutor then stated that he agreed with defense counsel that the case was a clear cut case and that there really was not anything counsel could do to help defendant. The court stated at that point that it felt that defense counsel did an excellent job in his cross-examination. Defendant again protested that his counsel had not cross-examined the victim at all concerning her identification of him. Defendant added that it seemed to him that in the way defense counsel framed his questions he had impliedly admitted that defendant was guilty. In denying defendant's motion for a mistrial, the court said that the dispute really was not over the adequacy of defense counsel's representation of defendant but over what trial tactics to use, and that generally trial tactics were left to the attorney. He said that defendant had the choice of conducting his own defense, with defense counsel present, if he did not want defense counsel to continue to represent him. He also gave defendant the choice of calling in a public defender to represent him, with defense counsel remaining as an advisor.

Defendant took this latter option, and a public defender was called into the case. The trial proceeded to its conclusion, with the public defender representing defendant. Defendant's privately-retained trial counsel again represented defendant at the time of the sentencing hearing.

■ We start with the basic principle that a criminal defense attorney cannot admit his client's guilt to the jury without first obtaining the client's consent to this strategy. *Wiley v. Sowders*, 669 F.2d 386, 389 (6th Cir.1982) (per curiam).

We can think of a few cases where such a strategy might make sense and where a defendant might agree to it.  One is where the defense attorney desires to admit that defendant is guilty of one of two charges in the hope of increasing his credibility with the jury and increasing the chance that the jury will acquit defendant on the other charge.  Another is where defense counsel admits that defendant is guilty of some lesser-included offense in the hope of persuading the jury to acquit defendant of the greater charged offense.  A third example is where the attorney's aim in admitting guilt is to increase the chance of a favorable sentence, something that applies particularly in a jurisdiction with jury sentencing.

■ In this case defense counsel did not come right out and expressly admit that defendant was guilty.  However, his cross-examination of the victim and her grandmother at least impliedly did that.  The fact that defendant objected as he did, before the case ever went to the jury, strongly suggests that defense counsel did not have defendant's permission to use this strategy.  Indeed, it appears that defense counsel was trying to do indirectly what defendant had said he did not want to do, namely, plead guilty and seek a favorable sentence from the trial court.  That is, it appears that defense counsel was impliedly admitting that defendant was guilty in order to lay the ground work for an ultimate argument to the court that defendant should receive a favorable sentence.

A strong argument can be made for the conclusion that any error was cured by what followed, namely, defendant's obtaining the services of a public defender, who conducted a standard defense for the remainder of the trial.  Other factors weighing against granting defendant a new trial on this ground are the strength of the state's case against defendant and the absence of any real defense, factors that suggest strongly that defendant still would have been convicted no matter how vigorously defense counsel had cross-examined the victim and her grandmother.

■ We believe, however, that a decision whether or not to admit guilt at a trial is a decision that under our system can only be made by the defendant.  That being so, we generally believe that if a defense counsel impliedly admits a defendant's guilt without the defendant's permission or acquiescence, the defendant should be given a new trial even if it can be said that the defendant would have been convicted in any event.  *Cf. State v. Rosillo,* 281 N.W.2d 877, 878–79 (Minn.1979) (if defendant can establish that his trial counsel refused to let him testify, defendant is automatically entitled to a new trial).  Under the circumstances, we hold that defendant is entitled to a new trial.

Reversed and remanded for a new trial.

KELLEY, Justice (dissenting).

I respectfully dissent.  In doing so, I agree with the principle that an attorney representing an accused of crime may not admit his client's guilt to the jury without obtaining the client's consent.  *Wiley v. Sowders,* 647 F.2d 642 (6th Cir.1981), *cert. denied,* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981).[1]  In this case, had defendant's counsel done that, to-wit, admitted his client's guilt without his client's permission, I would vote for reversal.  The majority opinion acknowledges that defense counsel did not expressly admit that the defendant was guilty.  However, the majority concludes that in his cross-examination of the victim and her grandmother the attorney impliedly left the jury with the impression that the defendant was guilty, a ruling with which I disagree.[2]  While I

1. The defendant's lawyer specifically admitted his client's guilt in making the closing argument.  He asserted that the client was "guilty as charged"; that the prosecutor had proved "beyond a reasonable doubt that [he is] guilty"; and that the question of guilt is "absolutely clear."  *Wiley v. Sowders,* 647 F.2d 642, 645 (6th Cir.1981), *cert. denied,* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981).

2. If, in fact, the attorney's cross-examination of the victim and her grandmother constituted an admission of his client's guilt, I concur in the

concede this is a close case, I arrive at a different conclusion after considering the totality of the facts that came to light from the time of the assault on the victim until the trial events described in the opinion.

The 10-year-old victim immediately reported the incident to her grandmother. She gave the grandmother a description of the man and described the car, which was a good description of the car being driven by the defendant on the day in question. Her grandmother immediately called the police. A motel clerk identified a registration form at the motel signed by the defendant on February 23, 1982, and gave a physical description that fit the defendant. Another clerk at the same motel gave a description of Wiplinger as a man who had paid the bill for the motel room which he had rented on the day the girl was assaulted and, further, made an in-court identification of the defendant as being the man who paid that bill. Within 2 weeks after the incident, the victim identified the defendant as the perpetrator at a 7-person line-up after less than 5 seconds of deliberation. The experienced trial judge observed in the omnibus hearing order—and the record and exhibits clearly corroborate him—that "it would be difficult to imagine a line-up, either photographic or in person, which was more fair to the defendant." These facts, considered together with the record evidence, in my opinion, clearly support the trial judge's observation that "a great deal of corroborating evidence exists which bolsters the victim's identification." Not only at the line-up but at the trial, the victim unhesitatingly and unequivocally identified the defendant as being her assailant.

With that state of the record, which the defense counsel knew existed, I cannot agree that his cross-examination amounted to an implicit confession that his client was guilty, or that it deprived the defendant of effective assistance of counsel.[3]

After the victim made these various identifications, which had been corroborated by other investigation, defense counsel on cross-examination merely used the defendant's name in propounding several questions. I cannot conclude under those circumstances that the defendant was prejudicially deprived of any constitutional right, denied effective assistance of counsel or that the result would have been any different had counsel, in questioning the victim used the identity of "the man" instead of Wiplinger's name. Under the circumstances, it may have been preferrable had he done so, but I would hold that the error, if there were error, did not amount to prejudicial deprivation of effective assistance of counsel. If there were any error, it seems to me that it was clearly harmless beyond a reasonable doubt. Even when conduct of law enforcement officials results in the admission of evidence that is constitutionally impermissible, courts have found harmless error beyond a reasonable doubt if untainted evidence provides overwhelming support for conviction, *See, e.g., Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Brown v. U.S.,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). We have applied the harmless error rule in various contexts. *State v. Charlton,* 338 N.W.2d 26 (Minn.1983) (error in jury instruction on duress defense burden of proof); *Watts v. State,* 305 N.W.2d 860 (Minn.1981) (admission of a gun); *State v. Clark,* 296 N.W.2d 359 (Minn.1980) (admission of defendant's statements harmless error even if *Miranda* rights violated); *State v. Clark,* 296 N.W.2d 372 (Minn.1980) (prosecutor's good-faith use of inaccurate impeachment evidence); *State v. Hull,* 269 N.W.2d 905 (Minn.1978) (admission of defendant's statement improperly elicited); *State ex rel. Kopetka v. Tahash,* 281 Minn. 52, 160

majority opinion's conclusion that the defendant did not give his consent or permission for the attorney to do so.

**3.** The trial judge observed after the defendant objected to the cross-examination of the victim

"to date the court could not have conducted the trial any better if he had been defense counsel, which I was for some 10 years as assistant public defender for the Ninth Judicial District, and I conducted many defenses."

N.W.2d 399 (1968) (introduction of illegally-obtained evidence at trial).[4]

In my view, in this case the evidence was overwhelmingly in favor of the state on the issue of identification. This was evidence untainted by any constitutional infirmity. This is a case where we should find error, if any there were, to be harmless beyond a reasonable doubt. On this record, this young victim should not have to face the emotional trauma of another trial, nor should the state be put to the expense of a retrial. I would affirm.

PETERSON, Justice (dissenting).
I join the dissent of Justice Kelley.

YETKA, Justice (dissenting).
I join the dissent of Justice Kelley.

WAHL, Justice (dissenting).
I join the dissent of Justice Kelley.

---

**4.** For a general discussion of the constitutional harmless error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and other cases *see* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L.Rev. 15 (1977); Mause, *Harmless Constitutional Error:* *The Implications of Chapman v. California,* 53 Minn.L.Rev. 519 (1969); Saltzburg, *The Harm of Harmless Error,* 59 Va.L.Rev. 988 (1973). For a strong attack on the constitutional harmless error rule, *see* Goldberg, *Harmless Error: Constitutional Sneak Thief,* 71 J. of Crim.L. and Criminology 421 (1980).