**Derrick Ramon DUKES, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C9–02–491.**

Supreme Court of Minnesota.

May 15, 2003.

Rehearing Denied June 16, 2003.

Deborah K. Ellis, St. Paul, for Appellant.

Michael A. Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for Respondent.

## OPINION

GILBERT, Justice.

This is our third review of this case and involves our review after remand of a post-conviction court's denial of a petition for relief. Our first review, *Dukes I,* was Dukes' direct appeal of his conviction for

the attempted aggravated robbery and attempted first-degree felony murder of Bennie Chaney, and first-degree felony murder of Joe McKinney for which he was sentenced to consecutive sentences of life imprisonment for first-degree murder and 180 months for attempted first-degree murder. *State v. Dukes,* 544 N.W.2d 13 (Minn.1996) (hereinafter *Dukes I*). We affirmed the conviction. *Id.* at 15

Our second review, *Dukes II,* was Dukes' appeal of the denial of his petition for postconviction relief. *Dukes v. State,* 621 N.W.2d 246 (Minn.2001) (hereinafter *Dukes II*). In *Dukes II,* Dukes argued, among other claims, (1) the postconviction court erred in dismissing as procedurally barred his claim that he had received ineffective assistance of counsel because his attorney had conceded his guilt as to the attempted aggravated robbery charge without Dukes' consent, and (2) the postconviction court erred in denying him a new trial on the basis of an accomplice's recantation of plea testimony that had been used to convict Dukes. *Id.* at 252, 257. We remanded to the postconviction court on these two issues. *Id.* at 255, 258. After holding an evidentiary hearing on October 10, 2001, the postconviction court made findings of fact and conclusions of law and entered an order denying relief, dated February 7, 2002. Now we are presented with *Dukes III,* the appeal of that denial. We affirm.

The facts of the underlying crimes in this case are set out in detail in *Dukes I.* 544 N.W.2d at 15–18. The essential facts are as follows. On April 1, 1994, Dukes and two accomplices, Kevin Lewis, n/k/a Hannabal Shaddai, and Steve Morrison, drove in Dukes' car from Dukes' home in Minneapolis to St. Paul. Morrison and Dukes were both armed with handguns. Bennie Chaney testified that the trio pulled up to the curb in front of him, that a man in the front passenger seat held up a gun, cocked it, and said something Chaney interpreted to mean hand over your money. Chaney ran behind the car and in the street. When he was about 30 yards away, he turned to see that the car was still parked at the curb. Hoping to scare them away, Chaney mimed going into his jacket for a gun at which point Morrison opened the back door, shouted something to Chaney, and fired two shots in his direction. Chaney escaped unharmed and at Dukes' trial Chaney identified Dukes as one of the men in the car.

Other witnesses then noticed the car as Dukes, Lewis, and Morrison continued driving through the neighborhood, eventually stopping across the street from a car owned by Joe McKinney. McKinney was seated in the driver's seat talking to some neighborhood children. Morrison and Lewis got out of Dukes' car and approached McKinney's car. Morrison walked up to the driver's window, brandished a gun, and demanded money. Meanwhile, Lewis had positioned himself on the other side of McKinney's car armed with Dukes' gun. When McKinney made a motion with his hand, both Morrison and Lewis fired and Lewis' shot hit McKinney in the back of the head. McKinney died early the next morning from the wound. Dukes was arrested and charged with the attempted aggravated robbery and first-degree attempted murder of Chaney and the first-degree murder of McKinney.

Before Dukes' trial, Lewis pleaded guilty to second-degree murder and attempted first-degree murder and in his plea hearing he testified to roughly the events outlined above. As part of the plea, Lewis was to receive a reduced sentence and he agreed to testify at the trials of Dukes and Morrison. At the beginning of Dukes' trial, however, on September 13, 1994, Lewis withdrew his plea and refused

to testify. The district court allowed the prosecution to read the redacted transcript of Lewis' plea hearing into the record.

During Dukes' trial, the prosecutor presented a strong case, establishing that ballistics matched the bullet that killed McKinney to Dukes' gun, that Dukes' car was used during the crimes, and that Dukes had been identified by eyewitnesses. Additionally, the prosecution relied on Lewis' plea transcript.

Defense counsel conceded some obvious facts that were bound to appear as evidence in his short, opening statement.[1] He told the jury that there were "two bungled holdups that resulted in the accidental, unintentional unexpected death of Joe McKinney." He described these acts as "disorganized crime" but told the jury that the essential proof of attempt, intent, and aiding and abetting would not be proved beyond a reasonable doubt. Counsel did concede in opening statement that there was an attempt to "rob intentionally * * * by two of the co-defendants. The evidence will not show that Derrick Dukes was aiding and abetting these people." The defense counsel further argued that though there were two crimes committed that day, they were not committed by Dukes and there was no first-degree murder. Defense counsel then stated that if Lewis and Morrison were on trial, he would urge the jury to find them guilty of attempted robbery and unintentional murder. Finally, he stated that Dukes was not an aider and abettor of these two men: "Derrick Dukes was duped."

Defense counsel also conducted cross-examination to impeach the memory and credibility of the prosecution's witnesses; criticized the use of leading questions by the prosecution in eliciting Lewis' plea; criticized the presentation of an accomplice's testimony; pointed out that the jury never heard or saw the accomplice; and questioned the reliability of the ballistics. Additionally, defense counsel called Dukes' mother, stepfather and girlfriend, who all testified that Dukes had money, and a friend of Dukes who testified that Dukes stated that he went to St. Paul believing he was helping Morrison run an errand and had no idea what his accomplices had planned.

In his closing argument, Dukes' attorney discussed the prosecution's failure to prove Dukes' intent to rob or murder either victim, and the lack of proved intent to kill by either of his accomplices. He also made four statements that Dukes now alleges amount to implied concessions of guilt. The jury convicted Dukes of all counts, and in *Dukes I* we affirmed, noting the strength of the prosecution's case against Dukes. 544 N.W.2d at 20 ("We believe the evidence of intent was strong enough that the jury could not rationally have acquitted appellant on the first-degree charge, where appellant and his accomplices planned the robbery, armed themselves with loaded handguns, proceeded to St. Paul for the express purpose of executing their plan, located two victims, and finally, in the course of their robbery spree, shot McKinney in the back of the head at close range."). No ineffective assistance of counsel claims were raised during that appeal.

Three years later, in September 1999, Dukes raised the issue of ineffective assistance of counsel for the first time in his petition for postconviction relief. He offered expert witness testimony of attorney Phillip Resnick, a well-respected member of the National Association of Criminal Defense Lawyers. Resnick testified to a number of examples of error, including his

---

1. The opening statement consisted of 4 pages in the trial transcript.

belief that counsel had conceded Dukes' guilt. Resnick stated that it was clear to him that trial counsel had switched strategies and should have stuck to the "duped driver" defense. Dukes then testified that he and his trial attorney had agreed to present the duped driver defense and go for an acquittal on all charges. Dukes also offered a handwritten affidavit dated June 24, 1998 and signed by Lewis, n/k/a Hannabal Shaddai, in which Shaddai claims that the statement he made during his plea hearing was "a lie." The district court denied Dukes' petition for postconviction relief.

In *Dukes II*, Dukes appealed the denial of postconviction relief and we affirmed the denial of most claims but remanded two issues to be heard on their merits. 621 N.W.2d at 250. The first of these remanded issues related to the assertion that Dukes' attorney had conceded his guilt as to the aggravated robbery count without his permission. *Id.* at 252. We stated that Dukes' attorney's closing statements "*could be* interpreted as conceding" guilt. *Id.* at 253 (emphasis added). We remanded this issue to the postconviction court because additional fact-finding and testimony from Dukes, his trial attorney, and other witnesses was needed. *Id.* at 255. Also remanded was Dukes' claim that the postconviction court erred in denying a new trial because of Lewis' recantation of his plea testimony. *Id.* at 257–258. We stated that the postconviction court appeared to have applied the test for newly discovered evidence instead of the test for newly discovered falsified testimony, and we remanded for the court to apply the appropriate test to this claim. *Id.*

During the remand proceedings in the district court, Dukes' trial attorney, Richard Coleman, testified as to the first issue. Coleman stated that he and Dukes had agreed that the defense was to be that Dukes drove the car but was unaware that crimes would be committed. He testified that Dukes at no time agreed to change the defense strategy from going for not guilty verdicts on all charges, and further stated that he did not intend to concede guilt and, in fact, did not concede guilt during closing arguments. The expert defense witness again testified that, in his opinion, the closing argument was not a reasonable attempt at getting not guilty verdicts on all counts because counsel had conceded guilt. No additional testimony was given regarding the second remanded issue. The postconviction court again denied Dukes' petition for relief.

The court found as follows in its Findings of Fact, Conclusions of Law, and Order Denying Relief:

6. Because trial counsel did not intend to concede guilt, there is no evidence in the record that counsel discussed such a strategy or that Petitioner explicitly agreed to such a strategy.

7. Petitioner's trial counsel testified that he did not intend to make and did not make any statements that could be considered as concessions of Petitioner's guilt.

8. Counsel's strategy was consistent throughout the trial.

9. The statements in the final argument, considered in the totality of the circumstances and were not necessarily concessions of Petitioner's guilt as to any element. [sic]

10. The legal and factual bases for the claim that Petitioner was denied the effective assistance of counsel at trial because his counsel may have made concessions of guilt during final argument were known and available to Petitioner at the time of his direct appeal.

11. Petitioner has not shown why the claim should in fairness be considered in a subsequent post conviction proceeding.

The postconviction court then concluded as follows:

1. Petitioner is procedurally barred from raising the claim that his conviction was obtained by the use of false testimony at trial. The legal and factual bases necessary to raise the claim were available at the time of the direct appeal. Fairness does not require consideration of the issue.

* * * *

3. Petitioner was not denied the effective assistance of counsel at trial.

4. The result of the trial was reliable. Petitioner has not shown that he was prejudiced by counsel's final argument.

5. The legal and factual bases for the claim that Petitioner was denied the effective assistance of counsel at trial were known to Petitioner at the time of the direct appeal. The claim is procedurally barred from consideration in a post conviction proceeding.

Dukes appealed the postconviction court's denial of relief.

## I.

A postconviction court's decision will not be overturned unless there has been an abuse of discretion. *Voorhees v. State,* 627 N.W.2d 642, 648 (Minn.2001). Because a petition for postconviction relief is a collateral attack on a judgment that has a presumption of regularity, the petitioner must establish, by a fair preponderance of the evidence, facts that warrant postconviction relief. *Pederson v. State,* 649 N.W.2d 161, 163 (Minn.2002). Accordingly, we review each of Dukes' allegations of error under an abuse of discretion standard.

Dukes presents two ineffective assistance of counsel claims: the first is that his attorney changed trial strategies by abandoning the "duped driver" defense; and the second is that his attorney made unconsented to concessions of Dukes' guilt in his closing argument. We begin by addressing the first of these claims.

Ineffective assistance of counsel claims are evaluated in accordance with the two-prong test that the Supreme Court articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that we adopted in *State v. Eling,* 355 N.W.2d 286, 293 (Minn.1984): "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

In deciding an ineffectiveness claim the court should

judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant deci-

sions in the exercise of reasonable professional judgment.

*Id.* at 690, 104 S.Ct. 2052. We also believe judicial scrutiny of counsel's performance must be highly deferential. As the Supreme Court noted:

Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy' * * *.

*Id.* at 689, 104 S.Ct. 2052.

■ With that deferential standard we address Dukes' first allegation that he was denied effective assistance of counsel because his attorney changed strategies, by abandoning the "duped driver" defense, without obtaining Dukes' approval or consent. Dukes contends that he and his attorney agreed to argue that he had been "duped" into being involved in the robbery scheme, as defense counsel did in the final sentence of the opening statement. In *Dukes II*, we stated that Dukes' counsel had not used the same strategy throughout trial. 621 N.W.2d at 254. However, after evaluating the testimony of defense counsel, the postconviction court found that trial counsel's strategy was consistent throughout the trial.

We note that defense counsel did shift his rhetorical emphasis and dropped from his closing argument the use of the term "duped," [2] which he had used in the opening statement in relation to the intent issue. His arguments were, however, consistent to the extent that in his opening

statement he described Dukes as having been duped and not an aider or abettor and in his closing argument he described Dukes as a "21 year old kid" and "knucklehead," [3] present when an unintentional, unexpected and unplanned death occurred. While these statements do differ and in hindsight may not represent exactly the same strategy throughout the trial, the semantic difference between being duped and "a knucklehead" is slight. The deletion from the closing statement of one word that was used in the opening statement was sound trial strategy and well within the bounds of reasonable, professional judgment and the wide range of professional, competent assistance. Furthermore, short of an implied admission of guilt, we have never held that a changed trial strategy in itself gives rise to an ineffective assistance of counsel claim and decline to do so now.

Dukes next argues that he was denied effective assistance of counsel because his trial counsel conceded his guilt during closing arguments. The district court found, in postconviction proceedings, that there was no evidence in the record that defense counsel discussed conceding guilt or that Dukes agreed to such a strategy. Dukes argues that his counsel nonetheless made statements during closing arguments that amounted to implied concessions of guilt. We must determine whether the district court abused its discretion in finding that these statements of defense counsel "were not necessarily concessions of [p]etitioner's guilt as to any elements."

As discussed above, the appropriate test for an ineffective assistance of counsel claim is the two-prong *Strickland* test: de-

2. Dupe: "one that is easily deceived * * * because lacking power to discriminate: fool a puppet or tool, esp. of a powerful person or idea." *Webster's Third International Dictionary* 702 (1993).

3. Knucklehead: "a stupid blunderer: dumbbell." *Webster's, Supra,* at 1253.

ficient performance and resulting prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. In *Dukes II,* however, we restated the rule we first announced in *State v. Wiplinger,* that prejudice is presumed when counsel concedes defendant's guilt without client consent (or acquiescence). *Dukes II,* 621 N.W.2d at 254 (citing *State v. Wiplinger,* 343 N.W.2d 858, 860 (Minn.1984)). We will limit our inquiry here to whether there was an unconsented to concession of guilt. In all the cases where we have addressed the issue of unconsented to concessions since our *Wiplinger* decision, we have concluded that the defendant objected to the concession, acquiesced or consented to the concession, or that there was no admission of guilt. *See State v. Provost,* 490 N.W.2d 93, 97 (Minn.1992).

We do not condone a defense counsel's concession of guilt without client permission or acquiescence. *Wiplinger,* 343 N.W.2d at 860. We have consistently held that even implied concessions require client consent. *See, e.g., Dukes II,* 621 N.W.2d at 254; *State v. Pilcher,* 472 N.W.2d 327, 337 (Minn.1991) (concluding defendant acquiesced to concessions); *State v. Moore,* 458 N.W.2d 90, 96 (Minn. 1990) (concluding defendant's immediate objection to the concessions proved lack of consent or acquiescence); *State v. Shoop,* 441 N.W.2d 475, 480 n. 3 (Minn.1989) (citing *Wiplinger* as an example of an error that renders a trial "fundamentally unfair"); *State v. Sanders,* 376 N.W.2d 196, 205 (Minn.1985) (citing *Wiplinger* as example of error that warrants a new trial); *State v. Eling,* 355 N.W.2d 286, 294 (Minn. 1984) (citing *Wiplinger* for the proposition that defense counsel cannot impliedly admit defendant's guilt). Yet, while we can never condone a lawyer admitting a defendant's guilt without his consent or acquiescence, we must be cautious in defining an "implied admission" to not allow the semantics of every questioned word, statement or misstatement of counsel by inadvertence, negligence or perhaps cleverness to be an automatic ground for a new trial.

In *State v. Vick,* we alluded to what constitutes an "implied admission" when we held that there had not been an implied admission because "[n]othing in [defense counsel's] statements [during closing argument] would lead a reasonable person to conclude that Vick's attorney admitted Vick's guilt. Because Vick's attorney's comments, *viewed in context,* do not constitute a confession, a new trial is not warranted on this basis." 632 N.W.2d 676, 688 (Minn.2001) (emphasis added).

To reach this definition of an implied admission we compared the facts in *Vick,* in which we determined there had been no concession of guilt, to those in *Wiplinger,* in which we held that counsel had impliedly conceded defendant's guilt. *Vick,* 632 N.W.2d at 688. In *Vick,* defense counsel traced the evidence presented by the prosecution and stated during closing argument "if you assume that Mr. Vi[c]k is guilty, then the arguments of [the prosecutor] make perfect sense." *Id.* By contrast, in *Wiplinger,* where the defendant was charged with the sexual assault of a 10-year-old girl, defense counsel asked the victim questions during cross-examination attempting to elicit that defendant had not threatened her or used force on her and had, in fact, been "gentle" "[t]hroughout all of this." *Wiplinger,* 343 N.W.2d at 859. The defendant's attorney thereby impliedly conceded contested facts that helped prove defendant's guilt even though defendant's position had been that he had never touched the victim. *Id.* at 861. We found that the questions counsel asked, when viewed in conjunction with defendant's claim that he had never touched the victim, constituted implied concessions of guilt. *Id.*

With that in mind, as we did in *Wiplinger* and *Vick*, we examine the context of the contested statements Dukes' counsel made to determine whether they amount to implied concessions. The challenged statements of defense counsel must be reviewed in the context of the totality of the circumstances of the trial. When the individual words are taken out of the context of a 717–page trial transcript and 20–page closing statement and lifted out of the transcript to be viewed in isolation, they take on more or even a different meaning than when viewed in context.

Dukes alleges that the following statements made during closing argument amount to implied concessions of guilt: (1) "[c]learly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney"; (2) "[Lewis' plea testimony] put Derrick Dukes right into it right up to his hips. You know it. I know it. He's in deep trouble on Count 1"; (3) while there is extreme doubt as to intent on the murder charges, "perhaps not so much as Count 1"; and (4) the "fault" and "blame" for McKinney's death lie "at the feet of Kevin Lewis and his aider_s and abettor_s." (emphasis added).

In prelude to these contested statements in defense counsel's closing argument, the jury heard unrebutted evidence that it was Dukes' car that was used during the crimes, Dukes' gun that was used to kill McKinney, and that Dukes had been identified by more than one eyewitness as having been in the car at the scene of the crimes. As we noted in *Dukes I*, the case presented by the prosecution was exceedingly strong and left Dukes' attorney with few credible arguments to present during closing argument.[4] The record left no question as to whether the wrongful deeds took place or who was present when these misdeeds occurred. In fact, in his opening statement, defense counsel conceded that the two men in Dukes' car were guilty of both attempted robberies and unintentional murder, but argued that the evidence would show that Dukes was duped.

Also in the opening statement, Dukes' counsel focused specifically on Count I, attempted aggravated robbery, and attempted to distinguish Dukes' activities from those of the two codefendants. Defense counsel stated, "The evidence will show there was an attempt to rob intentionally. There was an attempt to rob Chaney, there was an attempt to rob McKinney by two of the co-defendants. The evidence will not show that Derrick Dukes was aiding and abetting these people." In defense counsel's closing statement, there was some discussion about "concerted action," but such comments are consistent with Dukes' counsel's opening statement about the activities of the two codefendants and the lack of evidence showing that Dukes was aiding and abetting them.[5]

Defense counsel started his closing argument by reminding the jury what he had said in opening statements about the two bungled holdups and the unexpected, unintentional and unplanned death. He argued for acquittal on the murder charge.

---

**4.** "Appellant's claim of minimal involvement simply does not hold up against a record of plans being made at his home, the use of his car, his furnishing at least one of the weapons used, and his chauffeuring Lewis and Morrison as they pursued their shooting rampage. * * * [T]he evidence supporting the verdict is substantial." *Dukes I*, 544 N.W.2d at 20.

**5.** The dissent concedes that the "other three challenged statements might not, by themselves, constitute an implied concession, they each add to the concession made by the first challenged statement."

He stressed that Lewis had lied in the transcript of his plea hearing in order to obtain a favorable plea, and that he had not even testified in Dukes' case. Defense counsel further reminded the jury that there was no evidence of what Morrison, the other person charged in this crime, had said in support of the state's theory because he never testified.

In the context of these argument themes, defense counsel made the four contested statements. The first of these, "[c]learly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney," referred to the first victim of the attempted robbery. Dukes argues that this statement was a concession of his guilt on the robbery charge. However, this statement was made following defense counsel's review of the prosecutor's case. Dukes' attorney used a three-step closing argument strategy: (1) he reviewed the arguments of the opposing party, (2) he admitted that if those arguments are to be believed, his client should probably lose, and (3) he then explained why those arguments should not be believed.[6] Dukes essentially argues

that the second step of this strategy amounts to an implied concession. These arguments may not be the most eloquent or effective way to deal with obvious, inculpatory and largely unrebutted facts of two attempted aggravated robberies and shootings, and Dukes' counsel may have conceded more than necessary. However, they were uttered in a rhetorical context in response to the prosecution's evidence that defense counsel had just reviewed.

Furthermore, the closing argument started and ended with strong denials of Dukes being in on the planned robberies. Defense counsel commented that the facts were complicated, discussed arguments between Dukes and Morrison, one of the alleged coconspirators, reviewed the testimony about there having been a break in the action before rejoining or continuing the robbery, and made statements about Dukes not being in on the concerted action. Counsel also attacked the memory and credibility of Bennie Chaney to try to nullify the importance of his compelling testimony. He further argued that while Dukes may not be innocent, he was not guilty of the charged crimes. Considerable discretion must be granted to defense

---

6. The dissent suggests that this three-step process was not followed because "I do not find any point in the closing argument where Dukes' trial counsel attempts to refute the state's argument that Dukes was aiding and abetting an attempted aggravated robbery of Bennie Chaney." We direct the dissent to the following passage. After discussing the evidence the state presented against Dukes on Count 1, attempted aggravated robbery, defense counsel goes on to address the weaknesses in that evidence:

> But you have some troubling things in there, perhaps not as troubling as the intent to kill and the other two counts. But it really goes to the heart of the aiding and abetting.
> And I can just point out some things on that, perhaps not as persuasive as I might wish. You have the opportunity of people to put a gun in Mr. Dukes' coat down at the

bar because they know he's being taken out. And supposedly one or both of the aider and abettors were there. No other jackets are found in this storage room, although it's used as a cloak room by all the bouncers at the bar. You have the fact that Lewis told Tomika, Derrick didn't have anything to do with this. And you have the fact that Linda Fleischman said Derrick came home and said, "We got to go to the police." Or, "I want to go to the police."

In this passage, defense counsel criticizes the very evidence he earlier suggested that, if believed, made it appear that Dukes was aiding and abetting the aggravated robbery. Additionally, contrary to what the dissent argues, in referencing the six verdict forms, defense counsel argued for not guilty verdicts on all counts by saying that "Mr. Dukes is not innocent, but they also indicate that he's not guilty."

counsel under such circumstances and great caution must be exercised by our postconviction and appellate courts in retroactively evaluating these statements and their impact.

We hold that in light of the totality of the evidence before the jury, the postconviction court did not abuse its discretion in finding this first statement that "[c]learly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney" was not necessarily a concession of guilt.

■ The second alleged concession was made after a discussion of the lack of credibility of the recanted testimony of Dukes' accomplice, and it too is acceptable strategic defense rhetoric. Counsel noted that the accomplice testimony attempted to shift the blame to Dukes on Count I, attempted aggravated robbery, by stating that if that testimony is to be believed, "Dukes is in it right to his hips." However, counsel argued repeatedly that the accomplice testimony brought in through Lewis' plea transcript was not credible. We hold that such a strategy does not amount to an implied concession of guilt and affirm the postconviction court.

■ The third alleged concession was part of a comparative analysis of the strength of the evidence the prosecution presented on the robbery versus the murder charges. Defense counsel recited the evidence that had been presented to counter the prosecutor's evidence on the aiding and abetting charges and concluded with the following: "Perhaps not as persuasive,

and I wouldn't want to insult your intelligence on that issue, but there should be extreme doubt in your mind regarding the intent to kill of Chaney, and the intent to kill McKinney, perhaps not so much as Count 1 [the attempted aggravated robbery charge]." In *Dukes II*, we expressed concern about the impact on the attempted murder and murder charges of possible concessions to the aggravated robbery charge. 621 N.W.2d at 253–54. We further noted that counsel only argued that the jury should find the murder and attempted murder were unintentional, while failing to make such a statement about the robbery charge. *Id.* at 254. Upon remand, the postconviction court found there was no evidence in the record that counsel either discussed such a strategy or that petitioner explicitly agreed to such a strategy. That finding is not challenged in this appeal. However, the postconviction court also noted that Dukes' counsel testified he did not intend to concede guilt nor should his statements be considered as concessions of Dukes' guilt. The court further found that these statements "considered in the totality of the circumstances * * * were not necessarily concessions of [p]etitioner's guilt as to any element." The postconviction court then concluded as a matter of law that Dukes was not denied effective assistance of counsel at trial.

Defense counsel's contested comments may have been more appropriate had the district court granted his request for a lesser-included offense.[7] Absent the lesser-included offense, this argument at best amounts to a poor comparison of the evi-

---

7. During Dukes' trial after both parties rested, defense counsel attempted, with Dukes' vociferous urging, to get jury instructions for the lesser-included charge of second-degree unintentional murder while attempting to commit a felony offense. *See* Minn.Stat. § 609.19, subd. 2(1) (2002). This would have allowed him to argue that even if Dukes knew about

and was complicit in either of the two robbery attempts, the murder and attempted murder were unintentional so Dukes should be acquitted of the first-degree murder charges. In *Dukes I*, we affirmed the district court judge's refusal to give that instruction. 544 N.W.2d at 20.

dentiary strength on each count and, again, may have conceded more than necessary. However, our review indicates while counsel did argue that Dukes was not guilty on all three counts, there appears to have been more emphasis on arguments for acquittal on the murder and attempted murder charges than on the lesser charge of aggravated robbery. Counsel's argument that there should be "extreme doubt" on the intent to kill highlighted the importance of the more serious charges by using the words *extreme* doubt when only proof beyond a *reasonable* doubt was required to return a not guilty verdict. The off-handed statement, "perhaps not so much on Count I," is still in reference to the higher "extreme doubt" standard, which is more than is legally required, and is a rhetorical comparison between Counts I, II and III and mentioned in passing.

Our scrutiny of such a statement must be highly deferential in light of the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Dukes, in this case, has not overcome the presumption that under the circumstances the challenged action, while perhaps not the best trial strategy, still "might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. We hold that this statement was not an implied concession of guilt nor was the argument outside the wide range of professional, competent assistance.

 Finally, within 50 words of the end of his argument, defense counsel made the last contested statement in reference to McKinney's death: "[the fault and the blame] do[ ] lie at the feet of Kevin Lewis and his aiders and abettors." In that no party or witness alleged that there were more than three men in the car, the only people who could fall under the heading of

"Kevin Lewis' aiders and abettors" are Morrison and Dukes. Dukes argues, therefore, that this statement amounts to a concession of guilt on the murder charge.

The court instructed the jury on five elements requiring proof beyond a reasonable doubt to find Dukes guilty of first-degree murder: (1) there was a death; (2) the time and the place that the death occurred; (3) the actions of the defendant and/or his accomplices caused the death; (4) the act occurred while they were attempting to or carrying out an attempted aggravated robbery; and (5) the defendant and/or accomplices acted with the intent and purpose to kill or believed that their actions would have that result. The court instructed the jury that if any of these elements had not been proved, Dukes was not guilty of murder in the first degree.

Defense counsel conceded the first three of these elements with Dukes' consent. Conceding these elements was not only a reasonable defense strategy to which Dukes consented, but the concessions were to undisputed evidence and were so obvious that to somehow attempt to deny them would remove all credibility of any rational defense argument.

Dukes asserts that by stating "[the fault and blame] do[ ] lie at the feet of Kevin Lewis and his aiders and abettors," his defense counsel conceded the fifth element, that Dukes and his accomplices acted with the intent to kill Joe McKinney. However, defense counsel vigorously argued unintentional act of killing throughout the trial. This effort occurred repeatedly in the opening statement, in the cross-examination of witnesses and in the closing statement. The words "fault and blame" arose in the overall context of defense counsel's attempt to address the death of Joe McKinney. In doing so, he conceded that there was fault and blame that was attributable to Lewis and his

aiders and abettors, but again emphasized and reiterated that "it was unintentional, not intentional." These words may not have exemplified the best advocacy tactic available to defense counsel, but they were consistent with his argument that Dukes, though not innocent, was not guilty of the crimes with which he had been charged. In so arguing, defense counsel was attempting to draw a fine line on the nature of the wrongdoing between criminal responsibility and civil responsibility. Defense attorneys faced with difficult cases commonly argue that there is a difference between moral blameworthiness and criminal culpability.

The words fault and blame do connote some wrongdoing, but these words do not necessarily amount to concessions of criminal guilt. A defense attorney may sometimes be wise to bolster his credibility by admitting that a defendant has done an action while denying the crime with which the action deals. Criminal wrongdoing involves more than merely the objective circumstances that were presented to the jury and encompasses the requisite intent component. Instead, "fault and blame" may imply neglect, imperfection in character, failure to do what is right, moral transgressions and wrongdoing of an excusable kind.[8] Defense counsel's use of these words was, therefore, consistent with the instruction that provided "The defendant is not guilty of knowing participation in a crime if his participation was inadvertent, accidental or negligent."

Also consistent with this instruction was defense counsel's repeated statements that the death was unexpected, unintentional and unplanned so as to require an acquittal by the jury on the murder charges. Defense counsel even cited portions of Lewis' testimony contained in Lewis' plea transcript that when he shot, he was only trying to scare McKinney. Defense counsel followed up by saying it was not reasonably foreseeable that someone would get shot intentionally. He brought this argument to a close by arguing that if there was aiding and abetting, it was of an unintentional act and, though there might be corroborating evidence supporting both an inference of intent and of lack of intent, both inferences are reasonable so the jury must acquit Dukes of the murder charges. Defense counsel emphasized that the jury should have "extreme doubt" in regard to the intent to kill. Accordingly, we conclude that the use of these two words—fault and blame—in the context in which they were made and in light of all of the other arguments relating lack of intent, do not amount to an improper concession of criminal guilt so as to give rise to an ineffective assistance of counsel claim. In this trial, to hold otherwise would serve to render meaningless the law as instructed and the well-established facts presented throughout the trial. The ultimate purpose of such representation is that the adversarial process function properly to ensure a fair trial and just result. *Eling*, 355 N.W.2d at 293. That was accomplished here. We affirm the postconviction court on the grounds stated herein.

## II.

We next address the issue of whether Dukes is entitled to a new trial as a result of Lewis' recantation of his plea hearing testimony, which had been used to help convict Dukes. In *Dukes II*, we remanded to the postconviction court to apply the three-prong *Larrison* test for newly discovered falsified testimony. 621 N.W.2d at 257–58. On remand, the postconviction court applied the *Larrison* test to Lewis' recantation of his plea testimony

---

8. *Webster's Third International Dictionary* 229; 829 (1993) (defining blame and fault).

and determined that Dukes was not entitled to a new trial. As discussed in reference to the first issue, we review the findings of a postconviction court under an abuse of discretion standard. *Voorhees*, 627 N.W.2d at 648.

We adopted the Seventh Circuit's *Larrison* test in *Sutherlin v. State*: "Under the *Larrison* rule, the petitioner must meet three criteria: (1) the court must be 'reasonably well satisfied' that the testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial." 574 N.W.2d 428, 433 (Minn.1998) (citing *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928)). We stated in *Ferguson v. State*, however, that "*Larrison's* third prong should not be an absolute condition precedent to granting a new trial." 645 N.W.2d 437, 445 (Minn.2002). Instead, the appropriate focus of the test is on the first and second prongs: the validity of the recantation and its potential effect on the outcome of the trial. *Id.* The postconviction court here found (1) at trial, this court ruled there were sufficient guarantees of trustworthiness to admit the plea transcript, and an affidavit 4 years later stating it was "a lie" was not enough to satisfy the postconviction court that the plea testimony was false; (2) there was sufficient evidence to convict Dukes even without the testimony because he had been identified pretrial and in court, it was his car and his mother said he was the only one allowed to drive his car, he had the motive of getting money for his girlfriend, the murder weapon was in his coat, and he was caught lying to police during the investigation; and (3) if the information in Lewis' plea transcript had been "a lie," Dukes would have known that at the time of trial and cannot now claim to be surprised by Lewis' recanta-

tion. Accordingly, the postconviction court found that Dukes failed to pass the *Larrison* test.

We are satisfied that the postconviction court did not inappropriately rely on the third prong of the *Larrison* test, and we cannot conclude that the postconviction court abused its discretion in determining that the *Larrison* test was not met. If an accomplice's affidavit 4 years after trial stating nothing more specific than that his earlier testimony had been "a lie" was a sufficient ground for a new trial, then the *Larrison* test for determining when allegedly false testimony should result in a new trial would be unnecessary because any allegation that prior testimony was false would entitle an appellant to a new trial. We do not believe the rule should be read so broadly.

Accordingly, we affirm.

HANSON, Justice, files opinion concurring in part, dissenting in part, in which MEYER, J., joins.

HANSON, Justice (concurring in part, dissenting in part).

While I concur in the decision that the postconviction court did not abuse its discretion in determining that Lewis' recantation of his plea-hearing testimony did not warrant a new trial, I respectfully dissent with respect to the decision that the postconviction court did not abuse its discretion in denying Dukes' ineffective assistance of counsel claim. More specifically, I disagree with the majority's determination that the district court did not abuse its discretion in finding that statements made by Dukes' trial counsel during closing argument "were not necessarily concessions of petitioner's guilt as to any element."

I.

I agree that the case presented by the prosecution was strong and that Dukes'

trial counsel was left with few credible arguments to present during closing. But, viewing the closing argument as a whole, I have difficulty determining exactly what argument Dukes' trial counsel intended to make. The argument does not focus on any coherent defense. In this context, trial counsel's statements emphasizing the strength of the evidence against Dukes take on greater than normal significance. While recognizing that the postconviction court was also the trial court, and had the advantage of hearing the argument first hand, I would conclude that the words actually used by trial counsel, as recorded in the transcript of the closing argument, are not capable of being interpreted in any way other than as a concession of guilt to Count I, the charge of attempted aggravated robbery.

It is true, as the majority observes, that Dukes' trial counsel sometimes used a three-step process in argument, (1) repeating the argument of the state, (2) conceding the conclusion that must be drawn if the state's argument were correct and (3) explaining why the state's argument was not correct. But Dukes' trial attorney did not use that three-step process in discussing Dukes' guilt for attempted aggravated robbery under Count I.

This is most clear in connection with the first contested statement that "[c]learly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney." Standing alone, one might posit that this statement was a rhetorical recitation of the state's argument, which trial counsel did not accept and would refute. But when this statement is viewed in context, there is no suggestion that the statement was rhetorical or that counsel did not accept it. More importantly, trial counsel never did refute it.

The statement was made in the midst of this argument:

Now we get to the weakest evidence in the case. It's Dukes' car, with two guys who pull up to a guy, and one of the men in the car say, "Give me your money" or try to rob him, Bennie Chaney. *Clearly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney.* Can you make the leap to him aiding and abetting an attempted intentional killing of Bennie Chaney during an attempted aggravated robbery? This gets complicated. Well, you may say there was an attempted aggravated robbery. And you may say that there was an aiding and abetting. But what evidence do you have that Steve Morrison intended to kill him?

(Emphasis added.)

I do not find any point in the closing argument where Dukes' trial counsel attempts to refute the state's argument that Dukes was aiding and abetting an attempted aggravated robbery of Bennie Chaney. Trial counsel later argued that there was evidence that Dukes was not aiding and abetting in the second attempted robbery, of Joe McKinney. In that connection, trial counsel emphasized that there was a disagreement between Dukes and Morrison after the attempted robbery of Bennie Chaney that could be interpreted as terminating Dukes' participation in the robbery plan. But the premise of that argument is that Dukes did participate in the plan to rob Bennie Chaney. In fact, trial counsel begins that argument by saying: "They had decided *after the failed robbery* to go home." (Emphasis added.) He concludes that argument by saying: "Now, the evidence would allow you to infer, I agree, yes, it was *still a concerted action* [to proceed with the second attempted robbery], but there is less evidence than on the intent to show that perhaps Dukes was not [rejoining the attempted robbery of

McKinney]." (Emphasis added.) The reference to "still a concerted action" with regard to McKinney assumes that there was concerted action with regard to Chaney.

Although the other three challenged statements might not, by themselves, constitute an implied concession, they each add to the concession made by the first challenged statement. Thus, not only did Dukes' trial counsel fail to refute the first challenged statement that "[c]learly it would seem to be Mr. Dukes is aiding and abetting an attempted aggravated robbery of Bennie Chaney," he actually reinforced that concession by the second challenged statement that:

> Count 1 [attempted aggravated robbery], both Lewis' plea and Lewis' explanation to McConnon[1] put Derrick Dukes right into it right up to his hips. You know it. I know it. He's in deep trouble in Count 1.

Further reinforcement was provided by the third challenged statement "but there should be extreme doubt in your mind regarding the intent to kill Chaney, and the intent to kill McKinney, perhaps not so much as Count 1."

In this context, I cannot view the first challenged statement of Dukes' trial counsel as a rhetorical statement, but must conclude that it was an affirmative concession that was never qualified and never refuted. Accordingly, the postconviction court's finding that the statements "were not necessarily concessions of [p]etitioner's guilt as to any element" was an abuse of discretion.

This concession of guilt was a violation of Dukes' right to assistance of counsel in several ways. First, it was a direct concession of guilt to Count I, attempted aggravated robbery. There is no evidence that Dukes' consented to or acquiesced in the concession of guilt to Count I.

Second, a concession of guilt to attempted aggravated robbery also acts as a concession of guilt to an important element of the attempted murder and murder charges contained in Counts II and III. As we noted in *Dukes II*, "a concession of guilt to aggravated robbery essentially concedes most of the elements necessary to convict Dukes of the murder and attempted murder charges." 621 N.W.2d 246, 253 (Minn. 2001). It is technically true that there was one remaining element to be proven for each of those crimes, that someone, Lewis or Morrison, had the requisite "intent to effect the death of the person or another." Minn.Stat. § 609.185(a)(3) (2002). But we noted in *Dukes II* that the element of intent "was proven by Lewis' admission in his plea testimony." *Id.*

Moreover, we have often recognized, in the felony murder context, that a jury can infer the intent to effect death from the mere fact that a defendant took a gun to a robbery. Thus, in *State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968), we said:

> Where, as here, defendant prepared himself for the robbery by taking a gun which he has first examined to make certain that it contains live ammunition, thus prepared to shoot anyone who obstructs the robbery or his escape, the inference of premeditation and intent to shoot and kill is not only permissible, but virtually inescapable.

In fact, Dukes' trial counsel underscored this problem with the intent element of the attempted murder and murder charges in closing argument when he stated:

---

1. Kevin McConnon testified that Lewis gave him an explanation of the day of the attempt-ed robberies that contradicted Lewis' plea testimony.

Now, it is true, it is true under liability for crimes of another that if the crime is reasonably foreseeable that takes place during the intended crime, and in this case the intended crime being robbery, then you're guilty of that, too. And it is reasonably foreseeable to think if you bring a gun to a hold-up and someone gets shot and dies, that you are likewise responsible for it.

Based upon the postconviction court's finding that Dukes' trial counsel did not discuss with Dukes the strategy of conceding guilt to any element and did not obtain Dukes' explicit agreement to such a strategy, this concession requires a new trial. In the absence of any finding by the postconviction court that Dukes consented to or somehow acquiesced in trial counsel's concession of guilt, prejudice is presumed and a harmless error analysis is not appropriate. *Dukes II*, 621 N.W.2d at 254; *State v. Wiplinger*, 343 N.W.2d 858, 861 (Minn.1984).

### II.

The postconviction court also concluded that Dukes was procedurally barred from raising his claim of ineffective assistance of counsel in a postconviction proceeding because the legal and factual bases for that claim were known to Dukes at the time of his direct appeal. This conclusion is directly contrary to our holding in *Dukes II* that these claims fell within an exception to the general rule that claims raised or known at the time of direct appeal will not be considered on a petition for postconviction relief. 621 N.W.2d at 254–55. There, we recognized that the procedural bar does not apply to claims that require the court to hear testimony concerning the communications between the defendant and trial counsel. We said that "[t]he claim of whether Dukes consented to his counsel's admission of Dukes' guilt to aggravated robbery is exactly the type of claim that needs additional fact-finding before it can be resolved." *Id.* at 255.

It might be the better practice, in future cases, to require that a defendant, who wishes to pursue a claim of ineffective assistance of trial counsel that cannot be determined on the trial record, first move to stay the direct appeal to permit postconviction proceedings or be deemed to have waived the claim. But we did not require that procedure in *Dukes II* and our determination that Dukes was not precluded from raising the claim of ineffective assistance of counsel in a postconviction petition stands as the law of the case.

Because Dukes' trial counsel conceded Dukes' guilt of attempted aggravated robbery, Dukes did not consent to or acquiesce in that concession, and Dukes was not precluded from seeking review of the issue in postconviction proceedings, I would reverse the district court and order a new trial.

MEYER, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Sam Hanson.